**MOULTON CAVITY & MOLD, INC.**

v.

**LYN–FLEX INDUSTRIES, INC.**

Supreme Judicial Court of Maine.

Jan. 26, 1979.

Murray, Plumb & Murray, John C. Lightbody (orally), Peter L. Murray, Portland, for plaintiff.

Smith, Elliott, Wood & Nelson by Stephen Lamson (orally), Roger S. Elliott, Saco, for defendant.

Before McKUSICK, C. J., and WERNICK, ARCHIBALD, DELAHANTY, GODFREY and NICHOLS, JJ.

DELAHANTY, Justice.

Defendant, Lyn-Flex Industries, Inc., appeals from a judgment entered after a jury trial by the Superior Court, York County, in favor of plaintiff, Moulton Cavity & Mold, Inc. The case concerns itself with an oral contract for the sale of goods which, as both parties agree, is governed by Article 2 of the Uniform Commercial Code, 11 M.R.S.A. §§ 2-101 et seq. For the reasons set forth below, we agree with defendant that the presiding Justice committed reversible error by instructing the jury that the doctrine of substantial performance applied to a contract for the sale of goods. We do not agree, however, that based on the evidence introduced at trial defendant is entitled to judgment in its favor as a matter of law. The appeal is therefore sustained and the case remanded for a new trial.

An examination of the record discloses the following sequence of events: On March 19, 1975, Lynwood Moulton, president of plaintiff, and Ernest Sturman, president of defendant, orally agreed that plaintiff would produce, and defendant purchase, twenty-six innersole molds capable of producing saleable innersoles. The price was

fixed at $600.00 per mold. Whether or not a time for delivery had been established was open to question. In his testimony at trial, Mr. Moulton admitted that he was fully aware that defendant was in immediate need of the molds, and he stated that he had estimated that he could provide suitable molds in about five weeks' time.[1] Mr. Sturman testified that "I conveyed the urgency to [Mr. Moulton] and he said 'within three weeks I will begin showing you molds and by the end of five weeks you will have [the entire order].'"

In apparent conformity with standard practice in the industry, plaintiff set about constructing a sample mold and began a lengthy series of tests. These tests consisted of bringing the sample mold to defendant's plant, fitting the mold to one of defendant's plastic-injecting machines, and checking the innersole thus derived from the plaintiff's mold to determine if it met the specifications imposed by defendant. After about thirty such tests over a ten-week period, several problems remained unsolved, the most significant of which was "flashing," that is, a seepage of plastic along the seam where the two halves of the mold meet. Although characterized by plaintiff as a minor defect, Mr. Moulton admitted that a flashing mold could not produce a saleable innersole.[2]

It was plaintiff's contention at trial, supported by credible evidence, that at one point during the testing period officials of

---

1. Mr. Moulton testified on cross-examination that he knew that defendant had an outstanding order for innersoles of a certain type and that it was relying heavily on plaintiff to produce acceptable innersole molds in time for defendant to construct the innersoles and so fill the order.

   Q. [Y]ou were acquainted with the fact that they had this order and time was an important factor to them—
   A. [by Mr. Moulton] Right.
   Q. —to their customer, is that right?
   A. Right.
   Q. And it was urgent that these molds be made and completed so that they could start their runs to get their product out to their customer?
   A. That's right.
   Q. Right. Now, understanding this, you had some conversation to the effect—well, at

least in five weeks time you would have your molds completed and they could be making their runs, is that right?
   A. Right.

   A. [T]his five weeks is just an estimate of time.

2. Some months after the Moulton-Lyn-Flex contract was abandoned, the parties and their attorneys conducted a final test of the molds constructed by plaintiff. A number of the innersoles produced on that date were shown to Mr. Moulton at trial. He identified those defects in the innersoles that were caused by imperfections in the molds and agreed that "you could not make a saleable innersole with this type of trouble."

defendant signified that in their judgment plaintiff's sample mold was turning out innersoles correctly configured so as to fit the model last supplied by defendant's customer.[3] Allegedly relying on this approval, plaintiff went ahead and constructed the full run of twenty-six molds.

For its part, defendant introduced credible evidence to rebut the assertion that it had approved the fit of the molds. It also noted that Moulton's allegation of approval extended only to the fit of the mold; as Moulton conceded, defendant had never given full approval since it considered the flashing problem, among others, unacceptable.[4]

On May 29, some ten weeks after the date of the oral agreement and five weeks after the estimated completion date, Mr. Sturman met with plaintiff's foreman at the Moulton plant. A dispute exists regarding the substance of the ensuing conversation. Plaintiff introduced evidence tending to show that at that time, Mr. Sturman revoked defendant's prior approval of the fit of the sample mold and demanded that plaintiff redesign the molds to fit the last. Testimony introduced by defendant tended to show that it had never approved the fit of the molds to begin with and that on the date in question, May 29, plaintiff's foreman indicated that plaintiff simply would not invest any more time in conforming the molds to the contract. Mr. Sturman met the next day with Mr. Moulton, and Moulton ratified the position taken by his foreman. Thereupon, Mr. Sturman immediately departed for Italy and arranged to have the molds produced by the Plastak Corporation, an Italian mold-making concern, at a cost of $650.00 per mold. Plaintiff later billed defendant for the contract price of the molds, deducting an allowance for "flashing and shut-off adjustments." Upon defendant's refusal to pay, plaintiff brought this action for the price

less adjustments. Defendant counterclaimed for its costs in obtaining conforming goods to the extent that they exceeded the contract price.

At trial, plaintiff's basic theory of recovery was that it had received approval with regard to the fit of the sample mold, that in reliance on that approval it had constructed a full run of twenty-six molds, and that defendant had, in effect, committed an anticipatory breach of contract within the meaning of Section 2–610 by demanding that the fit of the molds be completely redesigned. On its counterclaim, and in response to plaintiff's position, defendant advanced the theory that plaintiff had breached the contract by failing to tender conforming goods within the five-week period mentioned by both parties.

After the presiding Justice had charged the jury, counsel for plaintiff requested at side bar that the jury be instructed on the doctrine of substantial performance. Counsel for defendant entered a timely objection to the proposed charge which objection was overruled. The court then supplemented its charge as follows:

> The only point of clarification that I'll make, ladies and gentlemen, is that I've referred a couple of times to performance of a contract and you, obviously, have to determine no matter which way you view the contract to be, and there might even be a possible third way that I haven't even considered, whether the contract whatever it is has been performed and there is a doctrine that you should be aware of in considering that. That is the doctrine of substantial performance.
>
> It is not required that performance be in any case one hundred percent complete in order to entitle a party to enforcement of their contractual rights. That is not to say within the confines of this case that the existence of flashing would be ex-

3. Those witnesses testifying to the alleged approval could not recall the exact date on which it was given.

4. Mr. Moulton admitted on cross-examination that Lyn-Flex never accepted the flashing.

Q. [Lyn-Flex accepted the mold] only as to fit?
A. [by Mr. Moulton] As to fit.
Q. Well, you didn't get [acceptance] on anything else then as to flashing or anything else you didn't get acceptance?
A. No, not on flashing.

cused or not be excused. It is just a recognition on the part of the law when we talk about performance, probably if we took any contract you could always find something of no substance that was not completed one hundred percent. It is for you to determine that whether it has been substantially performed or not and what in fact constitutes substantial performance.

In your consideration, and as I say in this case, that's not to intimate that something like flashing is to be disregarded or to be considered. It's up to you based upon facts.

The jury returned a verdict in favor of plaintiff in the amount of $14,480.82.[5]

## I

In *Smith, Fitzmaurice Co. v. Harris*, 126 Me. 308, 138 A. 389 (1927), a case decided under the common law, we recognized the then-settled rule that with respect to contracts for the sale of goods the buyer has the right to reject the seller's tender if in any way it fails to conform to the specifications of the contract. We held that "[t]he vendor has the duty to comply with his order in kind, quality and amount." *Id.* at 312, 138 A. at 391. Thus, in *Smith*, we ruled that a buyer who had contracted to purchase twelve dozen union suits could lawfully refuse a tender of sixteen dozen union suits. Various provisions of the Uniform Sales Act, enacted in Maine in 1923, codified the common-law approach. R.S. (1954) ch. 185, §§ 11, 44. The so-called "perfect tender" rule came under considerable fire around the time the Uniform Commercial Code was drafted. No less an authority than Karl Llewellyn, recognized as the primum mobile of the Code's tender provisions, (*see, e. g.,* W. Twining, Karl Llewellyn and the Realist Movement 270–

301 (1973); Carroll, *Harpooning Whales, of Which Karl N. Llewellyn is the Hero of the Piece; or Searching for More Expansion Joints in Karl's Crumbling Cathedral*, 12 B.C.Indus. & Comm.L.Rev. 139, 142 (1970)), attacked the rule principally on the ground that it allowed a dishonest buyer to avoid an unfavorable contract on the basis of an insubstantial defect in the seller's tender. Llewellyn, *On Warranty of Quality and Society*, 37 Colum.L.Rev. 341, 389 (1937). Although Llewellyn's views are represented in many Code sections governing tender,[6] the basic tender provision, Section 2–601, represents a rejection of Llewellyn's approach and a continuation of the perfect tender policy developed by the common law and carried forward by the draftsmen of the Uniform Sales Act. *See* Official Comment, § 2–106; Priest, *Breach and Remedy for the Tender of Nonconforming Goods Under the Uniform Commercial Code: An Economic Approach*, 91 Harv.L.Rev. 960, 971 (1978). Thus, Section 2–601 states that, with certain exceptions not here applicable, the buyer has the right to reject "if the goods or the tender of delivery fail *in any respect* to conform to the contract . . ." (emphasis supplied). Those few courts that have considered the question agree that the perfect tender rule has survived the enactment of the Code. *Ingle v. Marked Tree Equipment Co.,* 244 Ark. 1166, 428 S.W.2d 286 (1968); *Maas v. Scoboda,* 188 Neb. 189, 195 N.W.2d 491 (1972); *Bowen v. Young,* 507 S.W.2d 600 (Tex.Civ.App.1974). We, too, are convinced of the soundness of this position.

In light of the foregoing discussion, it is clear that the presiding Justice's charge was erroneous and, under the circumstances, reversibly so. The jury was informed that "[i]t is not required that performance be in any case one hundred per-

---

5. Plaintiff computed its claim by taking the contract price of $15,600.00 (26 innersole molds at $600.00 each) and subtracting $1,119.82 as an "allowance for flashing and shut-off adjustments at time of cancellation," thereby arriving at the figure of $14,480.18. (The jury's verdict thus exceeded the plaintiff's claim by sixty-four cents).

6. *See, e. g.,* §§ 2–508 (seller's limited right to cure defects in tender), 2–608 (buyer's limited right to revoke acceptance), and 2–612 (buyer's limited right to reject nonconforming tender under installment contract).

cent complete in order to entitle a party to enforcement of their contractual rights." Under this instruction, the jury was free to find that although plaintiff had not tendered perfectly conforming molds within the agreed period (assuming the jury found that the parties had in fact agreed on a specific time period for completion) it had nevertheless substantially performed the contract within the agreed time frame and was merely making minor adjustments when defendant backed out of the deal. Had the jury been instructed that plaintiff was required to tender perfectly conforming goods—not just substantially conforming goods—within the period allegedly agreed to and had they been instructed that, under Section 2–711, the buyer has the absolute right to cancel the contract if the seller "fails to make delivery," a different verdict might have resulted. Indeed, the supplemental instruction tended to encourage the jury to resolve the question by deciding whether "flashing" was or was not a substantial defect:

> It is not required that performance be in any case one hundred percent complete in order to entitle a party to enforcement of their contractual rights. That is not to say within the confines of this case that the existence of flashing would be excused or not be excused. . . . It is for you to determine . . . whether [the contract] has been substantially performed or not and what in fact constitutes substantial performance.

We find unpersuasive plaintiff's argument that the presiding Justice's instruction merely informed the jury that if it found that defendant had committed an anticipatory breach of the contract then plaintiff was not thereafter required to complete its performance as a condition precedent to recovery under the contract. Such an instruction might well have been appropriate and would certainly have been supportable under the applicable law. *Dehahn v. Innes*, Me., 356 A.2d 711, 719 (1976) ("When the other party has already repudiated the agreement, a tender would be a futile act and is not required by law."); §§ 2–610, 2–704. However, an examination of the

passage of the charge in question leads us to reject plaintiff's interpretation. Without informing the jury that it must first find that defendant had committed an anticipatory repudiation, the presiding Justice, without qualification, stated that "performance [need not] be . . . one hundred percent complete in order to entitle a party to enforcement of their contractual rights." Furthermore, the court drew a distinction between substantial and insubstantial defects, a distinction which, on these facts and under plaintiff's interpretation of the charge, would have been completely irrelevant. Finally, both the presiding Justice and counsel for plaintiff referred to the instruction at side bar as an explanation of the "substantial performance" doctrine. In legal parlance, that doctrine requires a buyer, under certain circumstances, to accept something less than a perfectly conforming tender. *See, e. g., Rockland Poultry Co. v. Anderson*, 148 Me. 211, 216, 91 A.2d 478, 480 (1952) (construction contract); *Jacob & Youngs, Inc. v. Kent*, 230 N.Y. 239, 129 N.E. 889 (1921) (Cardozo, J.) (construction contract). As such, it has no application to a contract for the sale of goods, and the jury should not have been permitted to consider it.

## II

■ In his testimony at trial, Mr. Moulton indicated that he was aware that to defendant time was a critical factor. He also stated that he had given defendant an estimated delivery date of five weeks from the date the contract was formed. On appeal, defendant takes the position that the parties agreed on a five-week time period for delivery and that plaintiff's failure to tender conforming goods after ten weeks constitutes a breach as a matter of law and precludes plaintiff from recovering under the contract.

We disagree. While on the one hand Mr. Sturman testified that Mr. Moulton had told him that the goods would be delivered in five weeks, on the other hand Mr. Moulton testified that it was clear that he was merely making an estimate. The testimony

thus left the jury at liberty to decide the factual question of whether the five-week time period was an agreed delivery date and thus a term of the contract or merely an estimate. While the interpretation of unambiguous language in 'a written contract falls within the province of the court, *Blue Rock Industries v. Raymond International, Inc.*, Me., 325 A.2d 66 (1974), questions of fact concerning the terms of an oral agreement are left to the trier of fact, *Carter v. Beck,* Me., 366 A.2d 520 (1976).

The entry is:

Appeal sustained.

New trial ordered.

POMEROY, J., did not sit.