**Michael SMYERS d/b/a Engineered Specialty Products, Plaintiff,**

v.

**QUARTZ WORKS CORP., Defendant.**

**Civ. A. No. 94–2025–KHV.**

United States District Court,
D. Kansas.

Feb. 15, 1995.

Anthony A. Stein, Kansas City, MO, for Michael Smyers.

David R. Buchanan, Brown & James, P.C., Michael P. Waddell, American Family Ins. Group, Kansas City, MO, for Quartz Works Corp.

### MEMORANDUM AND ORDER

VRATIL, District Judge.

Plaintiff Michael Smyers filed this breach of contract action in the District Court of Johnson County, Kansas, in December 1993. Defendant Quartz Works Corporation ("Quartz Works") removed it to this Court on January 21, 1994, pursuant to 28 U.S.C. §§ 1332 and 1441.

This action involves two contracts made between two merchants. Plaintiff claims damages for defendant's alleged breach of both contracts; defendant counterclaims, conceding that it breached the first contract, but alleging that it was plaintiff who breached the second.[1] The case was tried to the Court on September 15 and 16, 1994.

Having considered the evidence submitted before and during trial, as well as the parties' supplemental briefs, the Court makes the following findings of fact and conclusions of law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### Findings of Fact

Plaintiff Michael Smyers resides and operates his business, Engineered Specialty Products ("ESP"), in Olathe, Kansas. ESP manufactures and sells resistance welders and quartz crystal X-ray machines called goniometers. Both the welders and the goniometers are used in the manufacture of quartz crystal resonators, which are used in a wide variety of modern electric equipment.

---

1. Defendant originally raised other counterclaims in addition to its breach of contract action, but those have all been either abandoned by the defendant or rejected by the Court as unsupported by the evidence. Therefore, only the opposing breach of contract claims between the parties remain for ruling, and only those claims will be discussed here.

Defendant Quartz Works is a Massachusetts corporation in the business of purchasing welders, goniometers and other related equipment and reselling the equipment as a package to businesses that wish to operate quartz crystal manufacturing facilities. Such arrangements are typically "turn key" projects, in which Quartz Works orders all the equipment, sets up the facility and turns it over to the owners when it is ready for operation. Lech Morawiec is the president of Quartz Works.

In 1992, Quartz Works was working with Megabucks Trading Company ("Megabucks"), the general contractor for a private buyer in the Republic of Mongolia who wanted to install a complete quartz crystal facility. Megabucks had hired Quartz Works to purchase and install all of the quartz crystal equipment.

In 1992, Quartz Works and ESP began negotiations for Quartz Works to purchase two welders from ESP, and they also explored the possibility of ESP manufacturing two goniometers for Quartz Works. ESP had never manufactured a goniometer, and Mr. Morawiec was aware of this inexperience at the time negotiations began. Mr. Smyers testified that he was eager to try building a goniometer "from the ground up," and he was willing to give Quartz Works, as a potential buyer, a lower-than-market rate for the finished product in order to have that opportunity.[2]

On September 21, 1992, Quartz Works offered to purchase two welders from ESP at a total price of $88,825.00. At the time of its offer, Quartz Works also sent ESP a check for $66,618.75, representing a seventy-five percent down payment toward the total. Upon receiving Quartz Works' order, ESP sent back a counteroffer reflecting price adjustments for some of the related parts and a total purchase price of $89,125.00 for the welders. The invoice that ESP sent back to Quartz Works credited the payment Quartz Works had made and indicated that the total amount due was now $22,506.25.

The ESP invoice for the welders also included two additional terms. The first read "75% DOWN, 25% BEFORE SHIPMENT." The second provided that, if ESP were not timely paid, a service charge of 1.5% per month would be applied to the balance due. Furthermore, although the original purchase order from Quartz Works indicated it wanted the welders "ASAP," the revised invoice from ESP did not include a shipping date. There was no evidence at trial that Quartz Works objected either to the additional terms or to the omission of a shipping date. After sending its revised invoice and counteroffer to Quartz Works on September 25, 1992, plaintiff began working on the welders.

On November 11, 1992, defendant sent another purchase order to ESP. This one was for two single-diffraction goniometers, with accompanying software, and proposed a purchase price of $96,359.80. By its invoice of November 16, 1992, ESP agreed with the proposed price, but again added terms to which Quartz Works apparently did not object. ESP's invoice indicated again that if ESP were not timely paid, a 1.5% per month service charge would be applied to any overdue amount. The invoice also included the following payment terms: "⅓ DOWN, 90% BEFORE END OF '92, BAL. N/10 [within 10 days after shipment]." It reflected receipt of the one-third payment of $32,199.90 and indicated that the balance due was $64,239.90. ESP received no objections from Quartz Works regarding the additional terms, and it began work on the goniometers shortly thereafter.

Quartz Works did not pay ninety percent of the total due on the goniometer contract before the end of 1992, and the parties disagreed at trial about the contractual effect of this failure to pay. Mr. Smyers testified that the cash infusion the payment would have provided would have enabled ESP to give precedence to the Quartz Works project and move it "to the front of the line" ahead of other ESP customers' projects. If the goniometers had been given precedence over other projects, Mr. Smyers testified, they would have been finished by the February 1993 shipping date on the ESP invoice of

---

**2.** The record demonstrates that each ESP goniometer was priced between ten and twenty thousand dollars lower than other goniometers on the market.

November 16, 1992. Otherwise, all terms on the invoice were open for renegotiation. Mr. Morawiec, on the other hand, testified that the proposed ninety percent payment before the end of the year was merely to secure a three percent discount on the total price of the goniometers. He testified that Quartz Works opted to forego the discount and pay after the beginning of the new year, but that it was never his understanding that the delivery date was linked to the payment.

The record does demonstrate that receipt of the ninety percent payment by the end of the year was a condition of the discount; however, there is no evidence other than Mr. Smyers' testimony that the delivery date was contingent upon that payment by year-end.[3] The parties agree that when the ninety percent payment was not received by the end of 1992, ESP raised the total price of the goniometers to $99,340.00, and changed the payment terms to one-third down and two-thirds before shipment. At that point, Quartz Works was obligated to pay ESP $67,220.10 before shipment of the goniometers.

The goniometers were not delivered in February 1993; in fact, they were not shipped until October 1, 1993. Plaintiff contends that the later shipping date resulted from defendant's failure to pay the ninety percent payment before the end of 1992 and to inspect and test the goniometers during the month of September. In addition, plaintiff claims that during the earlier part of the year defendant in fact wanted to delay the shipping date for the goniometers because Quartz Works was experiencing cash flow problems with Megabucks, and operations in Mongolia had slowed.

Defendant paints a wholly different picture. Mr. Morawiec insists that he had no cash flow problems and that he complained throughout 1993 about the slowness of ESP's manufacturing process and the unreliable and unready state of the goniometers he had ordered. Although the evidence in the record is sparse on this point, it does appear that Quartz Works complained of delays to Smyers. Quartz Works notified Mr. Smyers at the end of March 1993 that it was sending its final equipment shipment to Mongolia the first week of April and that, if the welders and goniometers could not be included in the final shipment, Quartz Works expected ESP to pay the additional shipping charges to send the ESP equipment separately. However, because of Mr. Morawiec's health and other internal matters affecting timing, Quartz Works had not tested or approved the welders at that time, and, for reasons unrelated to ESP, the final shipment to Mongolia was not sent until at least the first week in May. Also, once the final shipment left for Mongolia without the ESP equipment, Quartz Works was less than diligent in inspecting and testing the equipment and in working out a revised shipment schedule with ESP. Quartz Works now argues that ESP's failure to deliver the goniometers in February constituted a breach of the goniometer contract.

While neither witness account is entirely credible, the Court has determined that the parties made certain changes to the goniometer contract both orally[4] and in writing be-

---

**3.** In support of his assertion that customers' projects were finished according to their "place in line," Mr. Smyers cites a draft letter of March 31, 1993 (after the proposed shipping date for the goniometers had passed) in which he informs Quartz Works that delivery dates given by ESP are always "approximations" based on the status of ESP's other works in progress. That letter, however, seems to undercut rather than support his testimony that the timing of the ninety percent payment affected the delivery date: the letter clearly states that the "lead time begins from the receipt of the down payment check, which [in this case] was received September 25, 1992." If the *down payment* determines a customer's place in line, as Mr. Smyers' letter says it does, then whether Quartz Works made its *second payment*—the ninety percent payment—before or af-

ter the end of the year should have made no difference whatsoever to Quartz Works' place in line at ESP.

**4.** It is true that any modification to a contract subject to the statute of frauds is itself subject to the statute of frauds, and thus, such modification must be in writing. K.S.A. § 84–2–209(3). However, an oral attempt to modify a contract term may serve as a waiver of that term unless the party wishing to enforce the term retracts the waiver and notifies the other party that it requires strict performance of the contract as written. K.S.A. § 84–2–209(5). There is no dispute that the parties discussed the fact that delivery of the goniometers would occur after February 1993, and Quartz Works never notified ESP that it would require strict performance of the Febru-

tween late 1992, when Quartz Works ordered the goniometers, and late 1993, when ESP shipped them. These changes were occasioned by delay in ESP's manufacturing processes; by cash flow problems that Quartz Works experienced in obtaining money from its Mongolian customer, with resulting delay in payments to subcontractors such as ESP; and by an evolving timetable that changed over the course of the year in response to evolving circumstances. Consequently, the Court finds that ESP's failure to deliver the goniometers in the early part of 1993 did not constitute a breach of the goniometers contract.

From September 20 to September 22, 1993, the parties met in Kansas for final inspection and testing of the welders and goniometers. At that time, Mr. Morawiec approved the welders for shipping to Massachusetts. Although the alignment of the goniometers still required minor adjustments, the parties agreed that those adjustments would be made and that the completed goniometers would be shipped no later than October 1, 1993. Mr. Morawiec did not inspect nor attempt to inspect the goniometers between the September 22 meeting and the shipping date of October 1, nor did he make any inquiries as to whether the alignment problems were being satisfactorily resolved.

During the September 22 meeting, the parties agreed to modify the payment terms of both the welder contract and the goniometer contract. Instead of requiring final payment prior to shipment, as the contracts had originally done, final payment was to be made upon proof of shipment to defendant.

The parties agreed that plaintiff would send a copy of the bills of lading to defendant by facsimile on the day of each shipment, and defendant would send payment by Federal Express that same day for arrival the following day.

On September 29, 1993, plaintiff had the welders crated and placed them with Yellow Freight Systems ("Yellow Freight") for shipment and delivery to defendant. He sent a copy of the bill of lading to defendant that day by facsimile. Although Quartz Works received the welders, subsequently sent them to Mongolia, and received payment for them from its customer, Quartz Works has not paid ESP the $22,506.25 which it acknowledges is due under the welders contract.[5]

Although Mr. Smyers expected payment for the welders on September 30, he did not receive it, and he was unable to reach Mr. Morawiec by telephone on September 30 or October 1, 1993. He sent Mr. Morawiec a message by facsimile on September 30 at approximately 5:30 p.m., informing him that ESP had not received payment for the welders as agreed, and stating that he expected to receive it the following day. Mr. Smyers also asked Mr. Morawiec to call him if any problems had arisen, but he heard nothing in response. At this point, for various reasons, Mr. Smyers became anxious about whether he would be paid for the goniometers he was about to ship. Mr. Morawiec had failed to pay for the welders and had also failed to respond to his messages. In addition, Mr. Smyers had perceived cash flow problems between Megabucks and Quartz Works

---

ary delivery date. Therefore, the Court finds that Quartz Works waived that term.

**5.** The parties intended that a step-down transformer for use with the welders would be included in the crate with the welders. However, when the welders were crated for shipping, the craters determined that the transformer would fit better in the crate with the goniometers, and they divided the equipment accordingly.

A step-down transformer is a common and readily available device used with many electrical machines manufactured in the United States for use in other countries; it adapts the electrical input to the differing electrical currents used elsewhere. The testimony in this case established that step-down transformers were neces-

sary to operate both the welders and the goniometers in Mongolia.

When it was denied access to the goniometer crate containing the step-down transformer for the welders, Quartz Works obtained a replacement transformer without material inconvenience or expense on its part.

Although defendant apparently attempts to fashion this change of crating plans as a breach of contract, the Court finds it was an insignificant alteration that did not affect the parties' contractual obligations. However, since $101.42 of the contract price for the welders represented payment for the step-down transformer, the Court reduces Mr. Smyers' award by that amount. Accordingly, the amount due under the welders contract is $22,404.83.

throughout his dealings with them, and mistrust between ESP and Quartz Works had grown throughout the course of their relationship. Finally, because the welders and goniometers were destined for Mongolia, Mr. Smyers feared that his recourse in the event of nonpayment would be severely limited.

Plaintiff nonetheless felt obligated to ship the goniometers on October 1, 1993, as agreed. Instead of shipping the goniometers to Quartz Works as the contract required, however, Mr. Smyers shipped them to ESP as addressee at the Massachusetts Yellow Freight terminal located fifteen miles from defendant's place of business. Again, he immediately sent a copy of the bill of lading to the defendant by facsimile.

Plaintiff testified that upon receipt of payment for both the welders and the goniometers, he intended to instruct Yellow Freight to change the addressee on the goniometer shipment from ESP to Quartz Works.[6] As mentioned above, however, Quartz Works did not send payment for either. Plaintiff continued to demand payment for both the welders and the goniometers; defendant continued to ignore plaintiff's telephone and facsimile messages.

The parties had reached an impasse. On October 6, 1993, Mr. Morawiec wrote to Mr. Smyers saying that he expected Mr. Smyers either to travel to Massachusetts to uncrate and test the goniometers at Quartz Works' local facility or to pay Quartz Works' expenses in hiring a qualified engineer to do so. He implied that Quartz Works would not pay for the goniometers until such tests were completed. Mr. Smyers immediately wrote

back to confirm that he would not release the goniometers for testing or any other purpose until Quartz Works made final payment for both the welders and the goniometers. Mr. Smyers also wrote that if he did not receive payment for the goniometers by the following week, he would "be forced to ship (at least) one to another customer." On October 12, 1993, Mr. Smyers again wrote that he was under pressure to ship one goniometer to another customer and that a sale of the other goniometer was pending.

Eventually, Mr. Smyers had the goniometers shipped back to Kansas, but did not sell either one. Plaintiff testified that the two single-diffraction goniometers are not marketable in the United States and that buyers in this country are only interested in double-diffraction goniometers, which are more accurate and more expensive. Plaintiff claims he has no marketing ability outside the United States, although he also testified that there are industry publications, read by producers and consumers of quartz crystal equipment worldwide, that contain advertisements of quartz crystal equipment such as goniometers. Plaintiff's assessment of the market value of his goniometers, which was offered at trial without any explanation as to its foundation, is that each is worth approximately $10,000.00 in the U.S. market. Mr. Smyers seeks damages for the full contract price of the goniometers, plus crating costs and interest at the contract rate of 1.5% per month, less the $20,000 approximate resale value of the goniometers.

Defendant's expert Thomas Alvord, who is one of only two of plaintiff's direct competi-

---

**6.** Mr. Smyers testified that if Quartz Works had paid for the welders *and* goniometers, as promised, ESP would have performed his part of the goniometer contract and Quartz Works "would never have known the difference." He testified that there would have been no delay in delivery of the goniometers since the truck on which they were shipped would have taken four days to reach Massachusetts, and by that time, the payment problem would have been resolved and Mr. Smyers would have switched the addressee on the goniometer shipment to Quartz Works.

It is, of course, not true that Quartz Works would never have known the difference. When the bill of lading for the goniometers was sent to Mr. Morawiec on October 1, 1993, it was immediately apparent to him that ESP had sent the

goniometers to itself rather than to Quartz Works.

Furthermore, Mr. Smyers' affirmation that he would have performed his part of the goniometer contract if Quartz Works would have performed its part rings false. Mr. Smyers testified that he would not have instructed Yellow Freight to release the goniometers unless Quartz Works had paid for both the welders and the goniometers. However, the parties never agreed that Quartz Works would pay for the goniometers in full before ESP relinquished control of them. In effect, Mr. Smyers' plan to switch the addressees on the shipment at the last minute changed the contract; therefore, it was he, not Quartz Works, who first departed from the requirements of the goniometer contract.

tors in the domestic market for quartz crystal equipment, opined that single-diffraction goniometers are not difficult to sell in the United States and that, in any event, modifying a single-diffraction goniometer to a double-diffraction goniometer is a relatively simple procedure which costs between $500 and $1000. Plaintiff countered that Mr. Alvord's goniometers are fundamentally different from plaintiff's, so that Mr. Alvord's opinions regarding the marketability and malleability of plaintiff's goniometers are totally inapposite.

Mr. Morawiec testified that because plaintiff's goniometers were not delivered in conformance with the contract, Quartz Works was required to purchase two goniometers from Mr. Alvord in order to satisfy its obligations to the Mongolian project and cover its losses from ESP's breach of the goniometer contract. The cost of the two Alvord goniometers was $120,960.00, and Quartz Works seeks damages for the difference between that amount and the lower amount which Quartz Works would have paid had ESP performed its obligations under the goniometer contract.

### Conclusions of Law

Contracts for the sale of goods are governed by the Uniform Commercial Code, as adopted in Kansas at K.S.A §§ 84–1–101 *et seq.* (the "Code").

#### A. The Welder Contract

Since the facts weigh clearly in plaintiff's favor on his claim under the welder contract and since defendant in fact concedes liability, this claim requires little discussion. Defendant is required to pay for the welders he ordered, received and shipped to Mongolia to fulfill his contractual obligations there.

The only issues in contention are whether plaintiff should be awarded interest on the amount due and, if so, from what date it should accrue. The Court finds that Quartz Works is liable to ESP for the principal amount of $22,404.83, plus the 1.5% per month (18% per annum) service charge set forth in the contract. The Court further finds that the interest began to accrue on September 29, 1993—the day ESP provided proof of shipment of the welders.

Plaintiff argues that interest should be calculated from April 1, 1993, when the welders were ready for shipment to Quartz Works. Plaintiff's claim is unsupported by the evidence and by the terms of the contract. Plaintiff's testimony was the only evidence that the welders were ready to ship on April 1, 1993. Mr. Morawiec had not been able to inspect and approve them at that time, as the parties clearly contemplated he would have the opportunity to do, and the record does not reveal any attempts by plaintiff to ship the welders before September 29, 1993.

In any event, whether the welders were ready for shipment on April 1 or not, the fact remains that they were not shipped until September 29, 1993. Although the payment terms on the welders contract evolved from requiring final payment before shipment to requiring it upon proof of shipping, at no time did the contract between the parties here contemplate that final payment would be due when the welders were merely ready—in ESP's sole estimation—for shipment. Therefore, the Court adheres to the contract terms in awarding interest from the time payment was due, which in this case was upon proof of shipment.

Defendant argues that no interest is allowable on the welders contract. In support of its argument, defendant cites *Tew v. Arizona State Retirement Sys.*, 69 B.R. 608 (S.D.Fla.1987), *rev'd on other grounds,* 873 F.2d 1400 (11th Cir.1989), in which the court disallowed two days' interest on securities subject to a repurchase agreement. In that case, ESM, the party that was supposed to repurchase the securities, breached the contract by failing to do so; two days later, the holder of the securities was able to sell them to a third party, but sought reimbursement for the two days' interest it lost as a consequence of ESM's breach. The court found that the interest was "in the nature of a claim for consequential damages resulting from ESM's breach" and that under the Code, "consequential damages are not recoverable by an aggrieved seller against a buyer

in an action for breach of contract for sale of goods." *Id.* at 610.

*Tew* is totally inapposite here because of its factual remoteness from this case. In *Tew,* the repurchase agreement did not prescribe interest in the case of default. Defendant in this case ignores the fact that the parties here—both sophisticated merchants negotiating at arm's length—agreed to a 1.5% per month service charge to compensate plaintiff in case of late payment. For the Court to disregard that term of the contract would be to rewrite the contract, nullify plaintiff's negotiated right to compensation and create a windfall for defendant, who for over a year has willfully failed to pay the money he owes—even though he concedes it is due—while he has had use of the money that Megabucks paid for the ESP welders.

Under Kansas law, parties to a contract may specify an interest rate to be charged in the event payment is not made on time, so long as the rate specified is not unreasonable or unconscionable:

> When a rate of interest or charges is specified in any contract, that rate shall continue until full payment is made, and any judgment rendered on any such contract shall bear the same rate of interest or charges mentioned in the contract....

K.S.A. § 16–205(a). *See also* K.S.A. § 84–2–719, official UCC cmt. 1 ("parties are left free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect"); *Bob Eldridge Const. Co. v. Pioneer Materials,* 235 Kan. 599, 684 P.2d 355, 362 (1984) (holding that agreed upon interest rate of 18% per annum on overdue accounts not unreasonable under the circumstances). Defendant has introduced no evidence whatsoever tending to show that the 1.5% per month service charge was unreasonable or contrary to custom or that Quartz Works did not knowingly agree to abide by that term in its contract with ESP. Accordingly, the Court orders Quartz Works to pay 1.5% interest on the principal amount due under the welders contract from September 29, 1993, until the date judgment is satisfied.

**B. The Goniometers Contract**

Plaintiff asserts that when Quartz Works failed to pay for the welders upon proof they had been shipped, he reasonably became concerned about Quartz Works' intention to perform its obligations under both the welder contract and the goniometer contract. Plaintiff claims that he made a written request for assurance and that Quartz Works, in failing to provide such assurance within a reasonable time, repudiated the goniometer contract. At that point, plaintiff argues, he was justified in suspending his performance under the goniometer contract by not shipping the goniometers to Quartz Works.

Defendant claims that plaintiff did not have reasonable grounds to request assurance of Quartz Works' performance under the goniometer contract; that plaintiff did not make a written request for such assurance; and that, by failing to ship the goniometers to Quartz Works, it was plaintiff who first breached the goniometer contract.

■ Under Kansas law, a party to a contract who becomes reasonably insecure of the other party's ability or intent to fulfill its obligations under the contract may demand assurance of due performance:

> **Right to adequate assurance of performance.** (1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return....

K.S.A. § 84–2–609. If assurance is not received in a reasonable time, the party demanding such assurance may suspend performance. *Id.* In order to suspend performance of his obligations under the goniometer contract pursuant to this section, plaintiff must (1) have reasonable grounds for insecurity regarding defendant's performance under the contract; (2) demand in writing adequate assurance of defendant's future

performance and (3) not receive such assurance from defendant. *LNS Inv. Co., Inc. v. Phillips 66 Co.*, 731 F.Supp. 1484, 1487 (D.Kan.1990).

### 1. Reasonable Grounds for Insecurity

■ By October 1, 1993, plaintiff had reasonable grounds for insecurity regarding defendant's performance under the goniometer contract. As mentioned before, plaintiff had been concerned about cash flow problems between Megabucks and Quartz Works throughout 1993, and he feared that such problems might affect Quartz Works' ability to pay ESP. In addition, both parties testified that relations between them had sharply deteriorated over time. Most importantly, Quartz Works had not complied with its contractual obligation to pay ESP for the welders upon proof of shipment. Mr. Morawiec had not only failed to offer any explanation for Quartz Works' failure to pay, but he had even failed to return facsimile and telephone messages from ESP in the days following delivery of the welders.

In view of this conduct, Mr. Smyers reasonably feared he would not be paid for the welders, and he was reasonably reluctant to relinquish control over the goniometers, as he had over the welders, because of his concern that once the equipment was shipped to Mongolia, any recourse for ESP in the event of Quartz Works' nonpayment would be severely limited.[7]

### 2. Written Demand for Adequate Assurances

■ On September 30, 1993, plaintiff made written demand for assurance of defendant's performance. The facsimile transmission he sent to Quartz Works reads as follows:

Lech, The Xray Units just left our plant to go to AEM to be crated first thing in morning. We have pickup scheduled between 1 and 3 PM. There should be no problem with that timetable. Also, Brian just told me that the stepdown transform-

ers and packaging cost us approx. $250 each, although we only billed approx. $100 each. *Did not get the FedX check today, I would expect it tomorrow.* It's been a heck of a day today ... Missed lunch. Have to meet with my lawyer 30 min. ago. Running late. If you want to talk tonight, please call car (816) 520 0846. Leave message. I will return call tonight. *If ANY problems, please call immediately.* Thanks, Mike

(emphasis added).

Under the Code, courts construe the writing requirement liberally. *LNS Inv.*, 731 F.Supp. at 1487. Furthermore, what constitutes adequate assurance is subject to the same evaluation of factual conditions as what constitutes reasonable grounds for insecurity. *Id.*; K.S.A. § 84–2–609, official UCC cmt. 4. Under certain circumstances, even a demand for payment of earlier accounts due may be construed as a demand for adequate assurance under the Code. *See, e.g., Toppert v. Bunge Corp.*, 60 Ill.App.3d 607, 18 Ill.Dec. 171, 175, 377 N.E.2d 324, 328 (1978).

Under the facts presented here, the Court finds that Mr. Smyers' written demand for payment of the amount due on the welders contract constituted written demand for assurances of defendant's due performance under the goniometers contract.

### 3. Receipt of Assurances

■ Mr. Smyers, of course, did not receive the assurances he sought. Not only did Mr. Morawiec fail to pay for the welders or otherwise respond to Mr. Smyers' repeated attempts to contact him, the record does not reflect any communication at all from Quartz Works to ESP until October 6, 1993—a week after the welders payment was due. Furthermore, even in his letter of October 6, Mr. Morawiec made no mention of paying or attempting to pay for the welders he had received.

---

**7.** Defendant argues that while ESP may have had reasonable grounds for insecurity regarding payment for the welders, the goniometer contract was a separate contract under which no such grounds for insecurity had yet arisen. This argument is specifically addressed and rejected by the Code's official commentary: "a buyer who falls behind in 'his account' with the seller, even though the items involved have to do with separate and legally distinct contracts, impairs the seller's expectation of due performance." K.S.A. § 84–2–609, official UCC cmt. 3.

In light of all the circumstances, the Court finds that, pursuant to K.S.A. § 84–2–609, Mr. Smyers was justified in suspending performance of his obligations under the goniometers contract as of October 1, 1993. The Court further finds that, by continuing to fail to pay for the welders or to provide other assurances, Quartz Works repudiated the goniometer contract.

#### 4. Damages

■ Where a buyer repudiates a sales contract before delivery, the seller has the right to withhold delivery of the goods. K.S.A. § 84–2–703. The seller then has several available remedies, including recovery of damages for repudiation (§ 84–2–708) and, in appropriate circumstances, recovery of the contract price (§ 84–2–709).

Plaintiff styles his prayer for damages as an action for the price under K.S.A. § 84–2–709; however, that section only applies "[w]hen the buyer fails to pay the price *as it becomes due*" (emphasis added). ESP's proof of shipment of the goniometers to Quartz Works was a condition precedent to Quartz Works' obligation to pay for them. Since ESP never shipped the goniometers to Quartz Works, the price never became due under the contract. Thus, section 84–2–709 is inapplicable to plaintiff's situation.

■ Plaintiff's appropriate remedy is found under K.S.A. § 84–2–708, which provides in pertinent part:

... the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this article....

The only evidence presented to the Court on the issue of the goniometers' market price came from plaintiff's testimony that each of the goniometers was worth approximately $10,000.00.[8] The undisputed contract price of the goniometers was $99,340.00, of which $32,119.90 was paid. The total amount due was therefore $67,220.10. When the market value is subtracted from the contract price, plaintiff's total amount of damages under K.S.A. § 84–2–708 is $47,220.10.

■ Plaintiff also claims that he is entitled to reimbursement for $1,500.00 which he paid to ship the goniometers to Massachusetts.[9] Under the Code, a seller whose buyer repudiates the contract is entitled to incidental damages:

> **Seller's incidental damages.** Incidental damages to an aggrieved seller include any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach.

K.S.A. § 84–2–710. In this case, the crating and shipping charges which plaintiff incurred to ship the goniometers to himself were not incident to Quartz Works' repudiation of the contract. Therefore, the Court declines to add such shipping and crating charges to plaintiff's award of damages.

■ Plaintiff also claims that he is entitled to collect the 1.5% per month service charge on amounts due under the goniometer contract. Although the service charge was warranted under the welders contract, the Court declines to award it in the case of the goniometers. The service charge was a creature of contract by which the parties addressed a situation in which Quartz Works received equipment but failed to pay the

---

**8.** Although the Court views plaintiff's testimony on this issue with some skepticism, defendant offered no contrary evidence on the market value of the goniometers.

Similarly, although defendant in cursory fashion has alleged that plaintiff failed to mitigate his damages, defendant offered no evidence concerning how plaintiff's failure to mitigate might specifically impact plaintiff's damage claim.

In view of defendant's utter failure of proof, the Court accepts plaintiff's estimate of the mar-

ket value of the goniometers. The Court also accepts plaintiff's testimony that, given his lack of access to foreign markets and his inability to convert his goniometers to double-diffraction, plaintiff did all that he was reasonably required to do to mitigate the damages he sustained as a result of the breach by Quartz Works.

**9.** Plaintiff does not claim he is entitled to recover expenses incurred in shipping the goniometers back to Kansas after defendant's repudiation.

amount due, as in the case of the welders. Because Quartz Works never received the goniometers, however, the balance under that contract never became due. The balance therefore could not become overdue, and thus, the service charge cannot be applied.

Finally, since the Court has determined that Quartz Works repudiated the goniometer contract by failing to provide adequate assurance upon ESP's reasonable request, defendant's claim for the cover damages it sustained in replacing the undelivered ESP goniometers is denied.

### Conclusion

After careful consideration of the facts and the law, this Court has determined that Quartz Works breached the welders contract. The Court has also determined that ESP was entitled to suspend its performance under the goniometers contract when Quartz Works repudiated that contract by failing to provide adequate assurance of its prospective performance when reasonably requested to do so by ESP. ESP is entitled to damages stemming from Quartz Works' breach of the welders contract and repudiation of the goniometers contract.

IT IS THEREFORE ORDERED that judgment be entered in favor of plaintiff as follows: defendant shall pay plaintiff the principal amount of $22,404.83 owing under the welders contract, plus interest at the rate of 1.5% per month accruing from September 29, 1993. The interest on the principal amount shall continue to accrue at the rate of 1.5% per month until such amount is paid in full.

IT IS FURTHER ORDERED that defendant shall pay plaintiff $47,220.10 owing under the goniometers contract. Interest shall accrue at the statutory rate from the date of this judgment.

IT IS FURTHER ORDERED that defendant's counterclaim is overruled in its entirety.