[No. 37581-4-I.   Division One.   February 10, 1997.]

ALASKA PACIFIC TRADING CO., *Appellant*, v. EAGON FOREST PRODUCTS, INC., *Respondent*.

*Bruce E. Larson, Denis W. Stearns,* and *Karr Tuttle Campbell,* for appellant.

*Scott A. Milburn, J. Michael Philips,* and *Preston Gates & Ellis,* for respondent.

AGID, J. — Alaska Pacific Trading Company (ALPAC) and Eagon Forest Products, Inc. (Eagon) contracted to sell and buy raw logs. After months of communications between the parties, the delivery date passed with no shipment. Eagon canceled the contract, alleging that ALPAC had breached. ALPAC brought an action for breach. The trial court found that ALPAC breached the contract by failing to timely deliver the logs and that there was no modification of the delivery date and Eagon did not repudiate. It granted Eagon's motion for summary judgment. ALPAC contends that failure to timely deliver the goods is not a material breach and that the parties modified the delivery date. Alternately, it argues that Eagon breached the contract by failing to provide adequate assurances or repudiating the contract. We affirm the trial court because ALPAC's failure to timely deliver goods is a material breach and the parties did not modify the delivery date.

Further, ALPAC did not request assurances, and Eagon did not repudiate the contract.

## FACTS

ALPAC and Eagon are both corporations engaged in importing and exporting raw logs. In April 1993, Setsuo Kimura, ALPAC's president, and C.K. Ahn, Eagon's vice president, entered into a contract under which ALPAC would ship about 15,000 cubic meters of logs from Argentina to Korea between the end of July and the end of August 1993. Eagon agreed to purchase the logs. In the next few months, the market for logs began to soften, making the contract less attractive to Eagon. ALPAC became concerned that Eagon would try to cancel the contract. Kimura and Ahn began a series of meetings and letters, apparently in an effort to assure ALPAC that Eagon would purchase the logs.

At Eagon, the home office was troubled by the drop in timber prices and initially withheld approval of the shipment. Ahn sent numerous internal memoranda to the home office to the effect that the corporation may not wish to go through with the deal, given the drop in timber prices, but that accepting the logs was "inevitable" under the contract. On August 30, Ahn sent a letter to the home office stating that he would attempt to avoid acceptance of the logs, but that it would be difficult and suggesting that they hold ALPAC responsible for shipment delay.

On August 23, Eagon received a faxed latter from ALPAC suggesting that the price and volume of the contract be reduced. Eagon did not respond to the fax. During a business meeting soon after, Kimura asked Ahn whether he intended to accept the logs. Ahn admitted that he was having trouble getting approval. Kimura thereafter believed that Eagon would not accept the shipment.

ALPAC eventually canceled the vessel that it had reserved for the logs because it believed that Eagon was canceling the contract. The logs were not loaded or

shipped by August 31, 1993, but Ahn and Kimura continued to discuss the contract into September. On September 7, Ahn told Kimura that he would continue to try to convince headquarters to accept the delivery. Ahn also indicated that he did not want Kimura to sell the logs to another buyer. The same day, Ahn sent a letter to Eagon's head office indicating that "the situation of our supplier is extremely grave" and that Eagon should consider accepting the shipment in September or October.[1]

By September 27, ALPAC had not shipped the logs. It sent a final letter to Eagon stating that Eagon had breached the contract because it failed to take delivery of the logs. Eagon's president, L.R. Haan, responded to the letter, stating that there was "no contract" because AL-PAC's breach excused Eagon's performance. ALPAC filed a complaint for breach of contract in King County Superior Court. Eagon brought a motion for summary judgment, arguing that it did not breach but that ALPAC breached by failing to deliver the logs. The trial court granted the motion and dismissed ALPAC's claims. AL-PAC's motion for reconsideration was denied.

## DISCUSSION

■ ALPAC appeals from the trial court's order granting Eagon's motion for summary judgment.

> A motion for summary judgment may be granted only if, "after viewing all the pleadings, affidavits, depositions, admissions and all reasonable inferences drawn therefrom in favor of the nonmoving party", the trial court finds, "(1) that there is no genuine issue as to any material fact, (2) that all reasonable persons could reach only one conclusion, and (3) that the moving party is entitled to a judgment as a matter of law".

*Higgins v. Stafford*, 123 Wn.2d 160, 168-69, 866 P.2d 31 (1994). The appellate court reviews the trial court's deci-

---

[1]The letter in question was translated from Korean and there is some question about which month was intended.

sion de novo. *Tollycraft Yachts Corp. v. McCoy*, 122 Wn.2d 426, 431, 858 P.2d 503 (1993).

### ALPAC Breached by Failing to Timely Deliver Logs

■ ALPAC's first contention is that it did not breach the contract by failing to timely deliver the logs because time of delivery was not a material term of the contract. ALPAC relies on common law contract cases to support its position that, when the parties have not indicated that time is of the essence, late delivery is not a material breach which excuses the buyer's duty to accept the goods. *See Cartozian & Sons, Inc. v. Ostruske-Murphy, Inc.*, 64 Wn.2d 1, 390 P.2d 548 (1964); *Scott Paper Co. v. City of Anacortes*, 90 Wn.2d 19, 578 P.2d 1292 (1978).[2] However, as a contract for the sale of goods, this contract is governed by the Uniform Commercial Code, Article II (UCC II) which replaced the common law doctrine of material breach, on which ALPAC relies, with the "perfect tender" rule. Under this rule, "if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may . . . reject the whole." RCW 62A.2-601(a). Both the plain language of the rule and the official comments clearly state that, if the tender of the goods differs from the terms of the contract in any way, the seller breaches the contract and the buyer is released from its duty to accept the goods. *Moulton Cavity & Mold, Inc. v. Lyn-Flex Indus., Inc.*, 396 A.2d 1024 (Me. 1979) (holding that the

---

[2]ALPAC also cites to RCW 62A.2-504, and several cases applying that section, for the proposition that the seller's breach must cause material delay or loss before the buyer's performance is excused. But that provision refers only to forming a proper shipment contract or notifying the buyer that the goods have been shipped. It does not negate the perfect tender rule. ALPAC also cites to several cases which purport to excuse the seller from complying with the perfect tender rule. For example, it cites *D.P. Tech. Corp. v. Sherwood Tool, Inc.*, 751 F. Supp. 1038 (D. Conn. 1990), for the proposition that the perfect tender rule does not apply to the time of delivery. Because Connecticut follows the minority rule which requires a showing of prejudice, *D.P. Tech.* does not apply here. ALPAC also cites *Ramirez v. Autosport*, 440 A.2d 1345 (N.J. 1982), which holds that, while the perfect tender rule applies, the seller has the right to cure within a reasonable time before the contract is terminated. However, ALPAC does not argue that it attempted to cure; thus, *Ramirez* is inapplicable.

"perfect tender" rule applies to time of tender). ALPAC does not dispute that the contract specified a date for shipment or that the logs were not shipped by that date. Thus, under the applicable "perfect tender" rule, ALPAC breached its duty under the contract and released Eagon from its duty to accept the logs.

### Parties Did Not Waive or Modify Delivery Date

■ ALPAC next contends that, even if failure to timely deliver is a breach, the parties modified the delivery date or Eagon waived timely delivery. The UCC II changed the common law of contracts to eliminate the need for consideration in contract modifications but did not otherwise alter the common law. RCW 62A.2-209(1). Mutual assent is still required, and one party may not unilaterally modify a contract. *In re Relationship of Eggers*, 30 Wn. App. 867, 638 P.2d 1267 (1982) (mutual assent and a meeting of the minds is required to modify a contract). ALPAC argues that Eagon agreed to modify the delivery date because it did not object to ALPAC's proposed changes in the amount and delivery time. It asserts that, if Eagon had not been silent during the discussions about the contract, the logs would have been shipped. Because the law requires mutual assent, Eagon's mere silence is not sufficient to establish a material issue of fact about modification.[3]

■ ALPAC also argues that Eagon waived the shipping date because it failed to comment on its passage and

---

[3]ALPAC also argues that Eagon induced the breach by bad faith and refusing to cooperate. It cites to several places in the record where Eagon did in fact indicate that it wished it could get out of the deal. However, it provides no valid authority for the proposition that a desire on the part of one party to avoid the deal, absent any active attempt to foil it, is sufficient to constitute frustration excusing breach. ALPAC cites to several inapplicable provisions of the UCC II and to *I-5 Truck Sales & Serv. Co. v. Underwood*, 32 Wn. App. 4, 645 P.2d 716, *review denied*, 97 Wn.2d 1033 (1982), for the proposition that deceptive conduct intended to induce breach violates the requirement of good faith. *I-5 Truck Sales* interprets the automotive repair statute and makes only a passing reference to the requirement of good faith in equity cases. ALPAC also fails to explain how Eagon's outward desire to avoid the contract rises to the level of fraud and violates the good faith requirement.

continued to discuss the contract after the shipping date had passed. Waiver is a factual question. *Davis v. Pennington*, 24 Wn. App. 802, 604 P.2d 987 (1979). Like all factual questions, a waiver issue may be resolved on summary judgment if, given the evidence in the record, a court could reach only one reasonable result. *Higgins*, 123 Wn.2d at 168-69.

■ If both parties to a contract allow the reasonable time for delivery to pass without complaint, a court may infer that the parties have extended the time for performance. *Davis v. Suggs*, 460 N.E.2d 665, 667 (Ohio App. 1983). Ahn and Kimura continued to negotiate until September 7, at least a week after the shipment date. Thus, Eagon may initially have waived the original shipment date as negotiations continued. However, by the end of September, when they exchanged their final correspondence, ALPAC still had not shipped the logs. Thus, even if the parties did waive the original date, ALPAC still had a duty to deliver the logs within a reasonable time. Its failure to ship the logs for an additional 20 days, while the price of logs continued to drop, was unreasonable and a breach.

## ALPAC Did Not Request Assurances

ALPAC's third contention is that summary judgment was inappropriate because a material factual issue exists about whether it requested assurances from Eagon and Eagon failed to respond. The UCC II provides that:

> A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

RCW 62A.2-609(1). ALPAC argues both that written

requests are not necessary and that it provided a written request for assurance.

■■■■ Washington courts have not directly determined whether a 2-609 demand for assurances must be in writing, or whether an oral request is sufficient, except to reiterate the rule that "RCW 62A.2-609 provides that when reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance." *Penberthy Electromelt Int'l, Inc. v. United States Gypsum Co.*, 38 Wn. App. 514, 518, 686 P.2d 1138 (1984). Other courts have recognized that the demand for assurances must be made in writing, absent "a pattern of interaction which demonstrat[es] a clear understanding between the parties that suspension of the demanding party's performance was the alternative, if its concerns were not adequately addressed by the other party." *Scott v. Crown*, 765 P.2d 1043, 1046 (Colo. App. 1988). For example, in *AMF, Inc. v. McDonald's Corp.*, 536 F.2d 1167 (7th Cir. 1976), and *ARB, Inc. v. E-Systems, Inc.*, 663 F.2d 189 (D.C. Cir. 1980), the courts found that the pattern of interaction between the parties made the demand for assurances sufficiently clear that no writing was necessary. In both cases, the seller supplied a prototype to the buyer which the buyer found unacceptable. The buyers clearly told the sellers they would not accept tender unless the problems with the prototypes were addressed. The courts held that these communications were sufficient even if not written. ALPAC relies on these cases to support its proposition that no written demand was needed in this case. It points out that Ahn had trouble getting approval from the Eagon home office and that Eagon knew it would lose money if the deal was completed.

Here, while Ahn had some idea that Kimura and ALPAC were concerned about the status of the contract, he did not understand that ALPAC would withhold perfor-

mance as a result.[4] This case is unlike *AMF, Inc.* and *ARB, Inc.*, in which the buyer clearly would not accept the product as it was represented in the prototype. ALPAC's concerns were not sufficiently clear to instruct Eagon that ALPAC would be withholding performance. Eagon and ALPAC each made assumptions about the other's performance under the contract, but neither clearly expressed a need for assurance. If we were to hold that, in every case where a contract becomes less favorable for one party, general discussions between the parties can be considered requests for assurances, we would defeat the purpose of 2-609. That section requires a clear demand so that all parties are aware that, absent assurances, the demanding party will withhold performance. An ambiguous communication is not sufficient. *See* 1 J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE § 6-2, at 288 (4th ed. 1995) (citing *Penberthy Electromelt Int'l*, 38 Wn. App. 514).

In the alternative, ALPAC argues that it did provide a

---

[4]Ahn testified that he believed that the original contract was confirmation that he would accept the cargo if shipped:

"Q: Did he ask you to confirm that Eagon was going to go ahead and complete the purchase of the logs?

"A: Did he ask for confirmation, yes.

"Q: And what did you say?

"A: He said he needed confirmation which is not necessary.

"Q: Oh, your statement was it was unnecessary?

"A: Yes

"Q: You answered him?

"A: No, no, I didn't answer him. He want to get a confirmation because — but, so I didn't say to him on that point because I'd have to talk to our buyer.

"Q: And did you contact the buyer?

"A: Yes, I did.

"Q: And did the buyer give you any confirmation that the logs were going to be accepted from Eagon?

"A: They confirmed already.

"Q: They had?

"A: Yes. April 26 or so, 29, so we don't need another confirmation.

"Q: So why couldn't you confirm to Mr. Kimura —

"A: I did April 26 already.

"Q: That was the confirmation?"

"A: Sure.

written request for assurances in the fax from Kimura to Eagon dated August 23, 1993 which stated:

> As we discussed, we would send a vessel to ship approx. 24-45,000 M3 of Argentina logs around mid part of Sept., 93.

> I understand, and recognize your troubles to sell, and concerns about Korean market at this time. Therefore, as a seller, I (ALPAC) will offer you to reduce volume and price . . .

> We have approx. 21,000 M3 of logs around port of Campana, Argentina, now. Therefore, I hope you can find times to check logs with me toward end of August to early Sept., 93.

> Pls let me know by return fax when is the best time to go over there. Tks, Kimura.[5]

The adequacy of a written demand for assurances is a question of fact. *S & S, Inc. v. Meyer*, 478 N.W.2d 857 (Iowa App. 1991). But it may be resolved on summary judgment if reasonable persons could reach only one conclusion, taking all inferences in favor of the nonmoving party. *Higgins*, 123 Wn.2d at 168-69. The written demand for assurances under RCW 62A.2-609 must generally be clear and unequivocal. *Scott*, 765 P.2d at 1046. Like the oral demand, a less clear statement will be considered sufficient only when the interaction between the parties is such that they understand that the demanding party will withhold performance unless assurances are tendered. In *Smyers v. Quartz Works Corp.*, 880 F. Supp 1425, 1433 (D. Kan. 1995), the court found adequate a letter stating that a shipment of goods was ready to go out, but that the seller had not received a previously-owed check. Given the parties' prior relationship and the context in which the letter was received, they knew that payment must precede the new shipment. Similarly, in *USX Corp. v. Union Pac. Resources*

---

[5]ALPAC also points to the September 27 letter informing Eagon that it had repudiated its obligations under the contract and informing Eagon that it expected Eagon to honor its contractual obligations. This letter may have constituted a demand, but ALPAC had already breached the contract and was not then entitled to request assurances.

*Co.*, 753 S.W.2d 845, 852-53 (Tex. App. 1988), the court found that repeated letters requesting information on when and how the shipments would take place were sufficient written demands for assurances. While the parties here both knew that the contract was no longer favorable to Eagon, there is no showing that Eagon would not perform, or that ALPAC expressed its belief that Eagon would not perform. The letter Kimura sent to Ahn stated only that ALPAC was willing to negotiate new terms for the contract, not that it believed Eagon would not perform. Therefore, neither the parties' interactions nor their correspondence rose to the level of a demand for assurances.

### Eagon Did Not Repudiate

■ ALPAC's final contention is that Eagon repudiated the contract prior to the delivery date. It argues that Eagon's concern about the drop in log prices and its difficulty in getting final approval from its head office were sufficient to present a material factual issue about whether Eagon intended to accept the logs. ALPAC correctly argues that the question of anticipatory repudiation is one of fact. *CKP, Inc. v. GRS Constr. Co.*, 63 Wn. App. 601, 620, 821 P.2d 63 (1991), *review denied*, 120 Wn.2d 1010 (1992). This issue, too, may be decided on summary judgment only if, taking all evidence in the light most favorable to the nonmoving party, reasonable minds can reach only one conclusion. *Higgins*, 123 Wn.2d at 168-69.

■ "An intent to repudiate may be expressly asserted or circumstantially manifested by conduct." *CKP, Inc.*, 63 Wn. App. at 620. However communicated, a court will not infer repudiation from "doubtful and indefinite statements that performance may or may not take place." *Wallace Real Estate Inv. Inc. v. Groves*, 124 Wn.2d 881, 898, 881 P.2d 1010 (1994). Rather, the anticipatory breach must be a clear and positive statement or action that expresses an intention not to perform the contract. *Id.*

ALPAC argues that Kimura's refusal to go to Argentina to see the logs and Ahn's statements that Eagon would be

losing money if it accepted delivery of the logs support its position that Eagon repudiated the contract. However, Kimura testified that Ahn never stated that he would not accept the cargo. Rather, Kimura assumed that the problems with approval from the home office were the equivalent of an inability or unwillingness to accept the cargo. Washington courts have refused to hold that a communication between contracting parties that raises doubt as to the ability or willingness of one party to perform, but is not an outward denial, is a repudiation of the contract. *Lovric v. Dunatov*, 18 Wn. App. 274, 282, 567 P.2d 678 (1977) (letter indicating that one party "may" not be able to perform was not direct and positive enough to be a repudiation). Therefore, as a matter of law, neither Eagon's expressed unhappiness about the drop in timber prices nor its problems completing the contract rise to the level of repudiation.

Affirmed.

BAKER, C.J., and WEBSTER, J., concur.

Review denied at 133 Wn.2d 1006 (1997).