965 P.2d 1102 (1998)
92 Wash.App. 586
STATE of Washington, Brian Pederson, Sheriff, Cowlitz County, and State of Oregon, Respondents,
v.
James R. BROWN and Sandy Brown, Husband and wife, Appellants.
No. 21989-1-II.
Court of Appeals of Washington, Division 2.
August 21, 1998.
Publication Ordered October 2, 1998.
*1105 John D. Ostrander, Portland, OR, for Appellants.
Ronald S. Marshall, Cowlitz County Deputy Pros. Atty, Kelso, Frederick John Caruso, Asst. Attorney General, Olympia, Christine A. Chute, Oregon Dept. of Justice, Salem, OR, for Respondents. *1103
*1104 SEINFELD, Judge.
In this breach of contract action, the trial court granted summary judgment to the State of Washington, the Cowlitz County Sheriff, and the State of Oregon (the Government) against James and Sandra Brown. The trial court found the contract between the Government and the Browns to be enforceable and ordered the Browns to specifically perform the parties' agreement. We affirm.

Facts
The Browns sold Michael Mahoney a 20-acre parcel of land in Kalama, Washington, by real estate contract dated September 21, 1987. Mahoney, using the name Gary F. Reeder, agreed to pay $49,500 with $10,000 down and payments of $3,170 every six months beginning April 5, 1988.
Mahoney used the property for a large-scale marijuana growing operation that the police uncovered pursuant to a search warrant on June 16, 1990. The next day, police executed another search warrant against property Mahoney owned in Prineville, Oregon. There they discovered a second large-scale marijuana growing operation.
On July 6, 1990, the State of Oregon filed a civil RICO action (Racketeer Influenced and Corrupt Organizations Act, ORS 166.715-166.735) in Oregon, seeking in part a judgment against Mahoney and a forfeiture of his interest in the Kalama property. As part of that action, Oregon obtained a temporary restraining order on July 6, and a preliminary injunction on August 23, prohibiting Mahoney from "injuring, destroying, transferring, removing or otherwise disposing of" his real or personal property.
Subsequently, Mahoney failed to make his October 1990 payment of $3,170 to the Browns and, on November 19, 1990, the Browns recorded a notice of intent to forfeit the real estate contract. The notice stated that to cure the default, Mahoney would have to tender $4,429.57 by February 22, 1991.[1]
Two days after the Browns filed their notice, the State of Washington filed a civil RICO action against Mahoney and placed a lien on his interest in the Kalama property under RCW 9A.82, the Criminal Profiteering Act. The State sought, in part, forfeiture of Mahoney's interest. On December 7, 1990, the State and the Cowlitz County sheriff filed an in rem drug forfeiture proceeding in which they sought forfeiture of Mahoney's interest in the property under RCW 69.50.505.
By letter dated November 30, 1990, the Browns' attorney acknowledged the Oregon and Washington actions and raised the possibility "that one or more of you might wish to reinstate the contract, take over Reeder's position in the contract and ultimately in that fashion gain control of the property." On February 19, 1991, the Browns offered to forfeit Mahoney's interest, sell the property, pay off their obligation and costs, and split the surplus with the Government.[2]
Shortly before that offer was made, the Cowlitz County Prosecuting Attorney received a letter from Mahoney stating that because of the seizure of the Kalama property, he could not make the cure payment. Mahoney demanded that the State and Cowlitz County make the payment or release the seizure. The prosecuting attorney then sent the Browns' attorney a check for $4,429.57 to cure Mahoney's default. The Browns' attorney retained the check but wrote an acknowledgment of receipt stating "rejection of tender *1106 is reserved." He left blank the space provided for rejection of cure.
On February 22, 1991, Mahoney gave the Browns' attorney a cashier's check in the name of Bruce Hampton to cure the default. Mahoney also gave the attorney an unrecorded real estate contract for the Kalama property from Mahoney to Hampton backdated to June 1, 1990.
After this attempted cure, the Government accepted the Browns' offer and agreed to split the surplus following a nonjudicial forfeiture and sale by the Browns. The Browns' attorney prepared the agreement and sent it with a letter dated February 25, 1991, stating "I believe I have captured the intent of all the parties and the terms." The agreement acknowledges that the Government has commenced an action to "forfeit Reeder's/Mahoney's interest in the real property" and provides that "in consideration of the mutual benefits to be derived from this agreement," "resale .... proceeds shall be distributed in the following priority:" (1) closing costs; (2) the Brown's costs of forfeiture and other legal costs; (3) unpaid interest accruing against the real estate contract; (4) $32,896.87 of unpaid principal; (5) if the sale price exceeds $70,000, division of the remaining balance fifty-fifty between the Browns and the Government.
On March 1, 1991, the Government responded. It requested changes in the distribution formula in the event it forfeited the property via judicial forfeiture. The letter stated "we believe that the agencies can cure Mahoney's default, forfeit Mahoney's interest, and retain all the net proceeds from a sale." It added, however, that the Government would split the proceeds with the Browns even if forced to proceed judicially.
On March 4, the Browns submitted a revised agreement providing that their forfeiture would clear the property of Mahoney's claims and those who claimed under him "other than the States." The Government responded by seeking a clarification that it was seeking only to "forfeit Reeder/Mahoney's interest in the property," not "forfeit[ure] of the property."
On March 7, 1991, the Browns sent the last revision, which included the requested change. The Browns signed the agreement on March 11, 1991, and returned the $4,429 "cure" check to the Government. Cowlitz County signed a copy of the final agreement on March 7 and the original on March 21; the State of Washington signed a copy on March 8 and the original on March 26.
The Browns' attorney recorded the Declaration of Forfeiture of Real Estate Contract on the same day that his clients signed the agreement. The parties subsequently defeated the Mahoney/Hampton claims, and the property was listed for sale.
A sale of the property failed after an adjoining landowner sued the Browns over easement rights. A court dismissed the easement suit on July 1, 1994, for failure to prosecute. On July 18, 1994, the Browns' attorney indicated to the Government that the property was being aggressively marketed.
On December 16, 1994, one of the investigating officers in the forfeiture action contacted the listing agency and learned that the property was no longer listed for sale "as per Mr. Brown's instructions." On January 24, 1995, Brown told the officer that he had taken the property off the market. "When I asked Mr. Brown specifically if he intended to honor the contract he stated `No'."
In April 1996, Brown received a purchase offer for the property; he agreed to consider the offer if he were to put the property up for sale. The prospective buyer persisted and offered $240,000, which had been the property's listing price.[3]
On August 26, 1996, the Government filed its complaint for breach of contract against the Browns in Cowlitz County Superior Court. The trial court granted the Government's motion for summary judgment after concluding that the agreement was supported by consideration and that the Browns were in breach. The court ordered the *1107 Browns to specifically perform the agreement by selling the property and sharing the proceeds as agreed.
The Browns then filed this appeal, claiming that (1) the agreement lacked adequate consideration, (2) that it is unenforceable due to a unilateral mistake, (3) that it is unconscionable, (4) that there is an issue of fact regarding breach, and (5) that the trial court erred in failing to dismiss Oregon's claims.

I. CONSIDERATION
When reviewing a summary judgment order, this court engages in the same inquiry as the trial court and considers all facts submitted and reasonable inferences from them in the light most favorable to the nonmoving party. Timberlane Homeowners Ass'n v. Brame, 79 Wash.App. 303, 307, 901 P.2d 1074 (1995). Summary judgment is available only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Neff v. Allstate Ins. Co., 70 Wash.App. 796, 799, 855 P.2d 1223 (1993).
In construing a written contract, basic principles require that (1) the intent of the parties controls; (2) the court ascertains the intent from reading the contract as a whole; and (3) a court will not read an ambiguity into a contract that is otherwise clear and unambiguous. Mayer v. Pierce County Med. Bureau, Inc., 80 Wash.App. 416, 420, 909 P.2d 1323 (1995). Interpretation of an unambiguous contract is a matter of law. If a contract is unambiguous, summary judgment is proper even if the parties dispute the legal effect of a certain provision. Mayer, 80 Wash.App. at 420, 909 P.2d 1323 (citing Voorde Poorte v. Evans, 66 Wash.App. 358, 362, 832 P.2d 105 (1992)).
A promise is not binding unless it is supported by consideration. Huberdeau v. Desmarais, 79 Wash.2d 432, 439, 486 P.2d 1074 (1971). But forbearance to prosecute a valid claim or assert a legal right constitutes sufficient consideration for a contract. The claim need not be indisputable or legally certain; where the validity of the claim is doubtful, the existence of a possibility of recovery is sufficient if the claim is asserted in good faith. Huberdeau, 79 Wash.2d at 441, 486 P.2d 1074; Johnson v. S.L. Savidge, Inc., 43 Wash.2d 273, 276, 260 P.2d 1088 (1953).
The Government contends that it had a substantial, good faith claim to Mahoney's interest in the property and that it relinquished the right to assert that claim in the Browns' forfeiture action. The Browns respond that after they successfully forfeited Mahoney's interest, they could have prevented the Government's forfeiture action by asserting the innocent owner defense. Thus, the Browns argue, when the Government agreed to forbear from pursuing its right to forfeit Mahoney's interest, it was not giving consideration because its promise had no value.
(a) The Innocent Owner Defense
The Uniform Controlled Substances Act allows the seizure and forfeiture of real property used to manufacture any controlled substance or acquired with the proceeds of the sale of a controlled substance. RCW 69.50.505(a)(8). Such forfeitures are intended to deter drug trafficking and to help defray the "immense costs" incurred by state and local governmental agencies in investigating, prosecuting, adjudicating, incarcerating and treating drug-related offenders. Laws of 1989, ch. 271, § 211.
RCW 69.50.505(a)(8) provides that "[a]ll real property, including any right, title, and interest in the whole of any lot or tract of land" is subject to seizure and forfeiture. An exception to this provision is set forth in RCW 69.50.505(a)(8)(i), which provides that "[n]o property may be forfeited pursuant to this subsection, to the extent of the interest of an owner, by reason of any act or omission committed or omitted without the owner's knowledge or consent." This provision is known as the "innocent owner defense." City of Bellevue v. Cashier's Check, 70 Wash.App. 697, 700 n. 2, 855 P.2d 330 (1993).
When the Government seizes property, it merely commences forfeiture proceedings; title does not vest until forfeiture is decreed. RCW 69.50.505(c); State v. Hendrickson, 129 Wash.2d 61, 75, 917 P.2d 563 (1996); 28 *1108 C.J.S., Drugs and Narcotics § 136, at 710 (1996). Relying on this law, the Browns claim that when they obtained their forfeiture decree against Mahoney and extinguished his rights to the property, they assumed ownership of all of the property as innocent owners who then could defeat the Government's right to pursue forfeiture. See United States v. 92 Buena Vista Ave., 507 U.S. 111, 127-29, 113 S.Ct. 1126, 122 L.Ed.2d 469 (1993) (because the government's title to property does not vest until forfeiture is decreed, innocent transferee can acquire ownership rights during the period between the time of the illegal acts and the entry of judgment of forfeiture).
We reject the Browns' argument because the Government's claim, while not indisputable or legally certain, apparently was asserted in good faith and possibly would have been successful. Thus, there was consideration for the agreement.
The Government based its interest on RCW 69.50.505(a)(8), the forfeiture statute, and the Browns based their claim on the interplay between their contractual rights and the "innocent owner" defense to the statute. In evaluating the innocent owner defense, a court could consider equitable doctrines and the timing of events. City of Bellevue, 70 Wash.App. at 705, 855 P.2d 330 ("`[E]quitable doctrines may foreclose the assertion of an innocent owner defense by a party with guilty knowledge of the tainted character of the property.'") (quoting 92 Buena Vista Ave., 507 U.S. at 130, 113 S.Ct. 1126).
Oregon had filed its RICO action before the Browns filed their notice of intent to forfeit and the Browns recorded their declaration of forfeiture on the same day they agreed to preserve the Government's claims in Mahoney's interest. Further, because the parties had agreed that the Browns would pursue forfeiture first, the Government refrained from pursuing a judicial forfeiture of Mahoney's interest and from filing a complaint against the Browns to permanently restrain them from forfeiting Mahoney's interest.
We disagree with the Browns that the reasoning in City of Bellevue "applies with equal force to this case." There, the property claimant knew of the property's possible taint but because he was serving merely as an appointed personal representative, the City of Bellevue court allowed him to assert the innocent owner defense, reasoning:
However, because of the representative nature of his interest, the equities weigh in favor of allowing him to assert the defense. As personal representative of the estate, the claimant is not acting on his own behalf, but on behalf of the creditors he represents.
70 Wash.App. at 705, 855 P.2d 330. The equities here, as compared to those in City of Bellevue, favor the Government and leave the possibility of a Government recovery. Thus, the Government gave consideration when it agreed in good faith not to pursue its forfeiture claim, a claim for which there existed a reasonable possibility of recovery.
(b) Mahoney's Ownership Interest
The Browns also contend that consideration was absent because Mahoney had no ownership interest in the property that the Government could forfeit. Pointing to the contract language, "[u]pon payment of all amounts due Seller, Seller agrees to deliver to Buyer a Statutory Warranty Deed in fulfillment of this Contract," they argue that title was not to pass until Mahoney fully paid for the property. See Juel v. Doll, 51 Wash.2d 435, 436, 319 P.2d 543 (1957) (grantor must deliver deed to the grantee to effectively pass title).
The Browns cite In re Forfeiture of One 1980 Porsche, 54 Wash.App. 498, 774 P.2d 528 (1989), to show Mahoney's lack of ownership. In Porsche, the issue was whether the seller of a car that was seized when the purchaser was arrested on drug charges retained a sufficient ownership interest to contest the forfeiture and assert the innocent owner defense.
The Porsche court cited a Georgia case stating that "`[t]he state in a forfeiture proceeding is not in the position of a creditor or lienholder, but its interest is only to prevent a guilty party from further misusing the *1109 property.'" 54 Wash.App. at 501, 774 P.2d 528 (quoting State v. Sewell, 155 Ga.App. 734(2), 735, 272 S.E.2d 514 (1980)). Concluding that forfeiture would be too harsh and would not prevent unlawful use of the property, the Porsche court found evidence that the seller retained title to the car. Consequently, it remanded for a determination of the extent of the seller's interest.
But the Porsche case does not hold that a vendee's interest cannot be forfeited. Further, the Legislature amended RCW 69.50.505 after Porsche to allow the forfeiture of real property interests. RCW 69.50.505(a)(8) allows for the seizure and forfeiture of all real property, "including any right, title, and interest in the whole of any lot or tract of land."
In addition, several cases suggest that a vendee does have an ownership interest in real property. One such case is Cascade Sec. Bank v. Butler, 88 Wash.2d 777, 781-82, 567 P.2d 631 (1977), where the court held that a real estate contract vendee's interest is "real estate" within the meaning of the judgment lien statute. See also Freeborn v. Seattle Trust & Sav. Bank, 94 Wash.2d 336, 340, 617 P.2d 424 (1980) (characterizing vendee's interest as real property and vendor's interest as personal property); Bays v. Haven, 55 Wash.App. 324, 328, 777 P.2d 562 (1989) (purchaser under executory real estate contract has substantial rights and is beneficial owner of real property); Chelan County v. Wilson, 49 Wash.App. 628, 632, 744 P.2d 1106 (1987) (real estate contracts are transfers of an equitable interest in property). These holdings support the Government's claim that it had a good faith claim for forfeiture with a reasonable possibility of recovery.
The Real Estate Contract Forfeiture Act, RCW 61.30, also supports the Government's claim. Under RCW 61.30.090(2) Mahoney had a right to cure that which the Government arguably acquired when it asserted a lien upon his interest. See Schultz v. Werelius, 60 Wash.App. 450, 454, 803 P.2d 1334 (1991) (under RCW 61.30.090(2) "`[a]ny person having a lien of record against the property which would be eliminated in whole or part by the forfeiture'" can cure a default); see also Linda Hume, The Washington Real Estate Contract Forfeiture Act, 61 Wash. L.Rev. 803, 818 (1986) ("The Act permits holders of security interests in or liens against the purchaser's interest to cure the default."). Given the merits of the various legal arguments available in support of Government forfeiture, the Browns received consideration when the Government gave up its right to proceed with a forfeiture action.
The Browns contend that Mahoney's interest, if any, consisted only of the $16,603 in payments he had made. The Government maintains that Mahoney's interest consisted of the difference between the sale price, less costs, and the amount owed on the underlying obligation and cites as support United States v. Federal Nat'l Mortgage Ass'n, 946 F.2d 264, 266-67 (4th Cir.1991) (forfeiture to the government subject to innocent lienholders' claims for outstanding principal and pre and post-seizure interest); and United States v. One Parcel of Real Estate, 789 F.Supp. 387, 391-92 (S.D.Fla.1992) (except for innocent owner's interest in mortgage and note, government has established a sufficient basis for forfeiture of the fee interest in the property).
Although we need not resolve the nature and extent of Mahoney's interest, we observe that the absence of settled law regarding this issue provided further consideration for the Browns' agreement with the Government. Even if the "innocent owner" defense was available to protect the Browns' vendor interest in the property, it might not have been available to reclaim the vendee's interest. See RCW 69.50.505(a)(8)(i) ("no property may be forfeited ... to the extent of the interest of an owner" because of an act committed without the owner's knowledge or consent) (emphasis added).
Here, the parties reached an agreement after considered negotiations and with the benefit of legal counsel. Further, the agreement was premised upon the understanding that the Government was asserting in good faith a substantial claim to Mahoney's interest and that it had a reasonable possibility of success. The Government's forbearance from asserting its claim constituted adequate consideration for the agreement.

*1110 II. UNILATERAL MISTAKE
The Browns, citing Gammel v. Diethelm, 59 Wash.2d 504, 368 P.2d 718 (1962), argue that neither they nor their former counsel knew about the applicability of the innocent owner defense and the corresponding case law that protected them from the Government's threatened forfeiture. They contend that the Government insisted that if they did not enter into the agreement, it would exercise its right of forfeiture and leave them with nothing. Thus, they maintain that they signed the contract based on a unilateral mistake.
In Gammel, the seller inserted into a contract a provision requiring monthly payments plus accrued interest, which differed from the preceding option that included interest in the monthly payments. After finding (1) that the purchasers were foreign born and had reading and language handicaps; (2) that the seller changed the interest provision without informing the purchasers; and (3) that the purchasers relied on the contract being drawn in accordance with the terms of the option, the court found that this was a clear case of mistake on the part of the purchasers and inequitable conduct on the part of the seller. Gammel, 59 Wash.2d at 507, 368 P.2d 718. Thus, it granted the purchasers' request for contract reformation.
The situation here is not comparable to that in Gammel. There is no evidence that the Browns lacked the ability to obtain and to understand information or that the Government engaged in inequitable conduct. Schwieger v. Harry W. Robbins & Co., 48 Wash.2d 22, 24, 290 P.2d 984 (1955) (mistake of law not grounds for avoidance of contract unless accompanied by showing of fraud or other unconscionable acts by other party). Rather, the agreement guaranteed the Browns payment of the amount owed on the underlying obligation and clearly stated that only Mahoney's interest was subject to forfeiture. Thus, the Browns are not entitled to relief under the doctrine of mistake.

III. UNCONSCIONABILITY
The Browns claim that the agreement is unconscionable because they had no meaningful choice "in light of the government's coercive efforts to make them believe that some property right was available for the government to forfeit." They also claim substantive unconscionability because the failure of consideration is one-sided or overly harsh. Finally, they claim that the agreement is unconscionable because it requires them to give the Government more than the amount that represented Mahoney's interest in the property.
Cases interpreting the doctrine of unconscionability generally fall within two classifications: substantive unconscionability and procedural unconscionability. Schroeder v. Fageol Motors, Inc., 86 Wash.2d 256, 259-60, 544 P.2d 20 (1975). Substantive unconscionability involves those cases where a clause or term in the contract is alleged to be one-sided or overly harsh, while procedural unconscionability relates to impropriety during the process of forming a contract. Schroeder, 86 Wash.2d at 260, 544 P.2d 20. "Shocking to the conscience," "monstrously harsh," and "exceedingly calloused" are terms used to define substantive unconscionability. Nelson v. McGoldrick, 127 Wash.2d 124, 131, 896 P.2d 1258 (1995).
Procedural unconscionability involves the lack of a meaningful choice, considering all the circumstances surrounding the transaction including "`[t]he manner in which the contract was entered,' whether each party had `a reasonable opportunity to understand the terms of the contract,' and whether `the important terms [were] hidden in a maze of fine print....'" Schroeder, 86 Wash.2d at 260, 544 P.2d 20 (quoting Williams v. Walker-Thomas Furniture Co., 350 F.2d 445, 449, 18 A.L.R.3d 1297 (D.C.Cir. 1965)). In examining an unconscionability claim, we consider the circumstances at the time the contract was made. Jeffery v. Weintraub, 32 Wash.App. 536, 544, 648 P.2d 914 (1982).
Given our conclusion that the agreement was supported by consideration, we find no merit in the Browns' argument concerning substantive unconscionability. Nor do we see evidence of procedural unconscionability. The agreement was the result of *1111 extensive negotiation and was revised several times by both parties. The Browns clearly had a reasonable opportunity to understand the terms, none of which was concealed in fine print.
Further, both parties stood to gain under the agreement as both benefited by a nonjudicial forfeiture. The property's subsequent appreciation in value is irrelevant because we evaluate unconscionability as of the time of the agreement. The courts will not relieve parties who are competent to contract from a bad bargain unless the consideration is so inadequate as to be constructively fraudulent. Rogich v. Dressel, 45 Wash.2d 829, 843, 278 P.2d 367 (1954).

IV. ISSUE OF FACT
The Browns contend here that the trial court erred in granting the Government summary judgment because there are issues of fact regarding whether they breached the agreement.
To constitute a repudiation, a party's language must be sufficiently positive to allow one to reasonably interpret it as stating that the party will not or cannot perform. Restatement (Second) of Contracts, § 250, comment b, at 273 (1979). Doubtful and indefinite statements and statements that, under certain circumstances that in fact do not yet exist, the performance will not take place, will not create an immediate right of action. 4 Arthur Corbin, Contracts § 973, at 905 (1951).
The Browns contend here that they did not breach the agreement because of paragraph 7, which reads as follows:
7. Assuming the successful forfeiture by Browns of the Real Estate Contract of Reeder/Mahoney and any other parties claiming by, through or under him, other than the States, then the property described in Exhibit "A" shall remain in the ownership of Browns with the complete right to hold and manage said property and with the responsibility of any taxes or assessments which may be applicable thereto. The sale of the property described in Exhibit "A", or any part thereof, will be only upon the prior written consent of all parties hereto.
The Browns argue that because they have not consented to a sale, they cannot be in breach of the agreement by not selling the property. They also point out that the agreement does not provide that the property must be sold at or within any particular time.
The Government responds by pointing to paragraph 3 of the agreement, arguing that it shows the clear intent of the parties to market and sell the property:
3. Upon completion of the forfeiting of the contract by Browns such that title to the property described in Exhibit "A" is cleared of any claim or interest of Gary F. Reeder, aka Michael Mahoney, and any other person claiming by, through or under him other than the States, then the property shall be resold or, upon the agreement of the parties, shall be listed "for sale" by a competent real estate agent in the Cowlitz County area whose final selection will be made by Browns.
While the agreement does not provide a time frame for the sale, the Government argues that a reasonable time is implied and that such time has elapsed. See Spake v. Elder, 1 Wash.App. 116, 123, 459 P.2d 820 (1969) (when the closing date is not fixed in the contract, a reasonable time after acceptance must be allowed to perform).
On December 16, 1994, the Government discovered that the Browns had taken the property off the market. On January 24, 1995, one of the investigating officers in the forfeiture action contacted Mr. Brown, who stated that he had told his real estate agent not to sell the property. When the officer asked Brown if he intended to honor the contract, he answered "no." In April 1996, Brown told an interested buyer that he would consider his offer if he put the property up for sale. On June 10, Brown was offered $240,000 for the property, which had been its listing price.
These actions are sufficiently definite to constitute a repudiation of the agreement. Clearly, a reasonable time for performance had passed when the Government sued for breach in 1996, five years after the parties entered the agreement in 1991.

*1112 V. OREGON'S CLAIMS
Finally, the Browns argue here that the Government has not provided legal authority that would have allowed Oregon to forfeit Washington property in Washington courts. Thus, they suggest there was no consideration for the agreement with Oregon.
In filing a civil RICO action against Mahoney, Oregon sought a monetary judgment against him as well as forfeiture of his interest in properties that were part of his racketeering enterprise. Under the Uniform Enforcement of Foreign Judgments Act, a foreign judgment filed in a Washington superior court is treated in the same manner as a judgment of the superior court of this state. RCW 6.36.025.
Although Oregon suspended its RICO action during settlement negotiations with the Browns and, thus, did not obtain a judgment against Mahoney, its forbearance from proceeding provided consideration. Thus, the trial court did not err in granting summary judgment in favor of Oregon.
We affirm.
MORGAN, P.J., and PENOYAR, Judge Pro Tem., concur.
NOTES
[1] In May 1991, Mahoney was convicted in Cowlitz County of manufacturing marijuana and of conspiring to deliver marijuana.
[2] In their reply brief, the Browns attach as Appendix 1 a letter indicating an earlier offer made by the Government. This letter is not in the clerk's papers, so we do not consider it. State v. Bugai, 30 Wash.App. 156, 158, 632 P.2d 917 (1981) (court must confine itself to record for knowledge of the case).
[3] In Appendix 3 to their reply brief, the Browns include a subsequent offer from the same party that lowers the offered price to $230,000. This offer is not in the clerk's papers and is not considered here. Bugai, 30 Wash.App. at 158, 632 P.2d 917.