# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| BRIAN FAY, a single person, ) | No. 78111-1-I |
| ) | |
| Appellant, ) | DIVISION ONE |
| ) | |
| v. ) | |
| ) | UNPUBLISHED OPINION |
| SHOWCASE MOTORS, a Washington ) | |
| corporation d/b/a HARRIS-FORD, INC., ) | |
| and bonding company DEVELOPER'S ) | |
| SURETY AND INDEMNITY COMPANY, a ) | |
| California company, ) | |
| ) | |
| Respondents. ) | FILED: August 12, 2019 |
| ) | |

ANDRUS, J. — Brian Fay sued Showcase Motors dba Harris-Ford, Inc., after purchasing and then returning a 2009 Shelby Mustang to the dealership. Fay challenges the summary judgment dismissal of his claims of misrepresentation, violations of Washington's "bushing" statute, RCW 46.70.180(4), and violations of the Consumer Protection Act (CPA), chapter 19.86 RCW. He also challenges the dismissal of his remaining bushing and CPA claims at trial and the entry of a deficiency judgment against him. Because there were genuine issues of material fact on Fay's misrepresentation and bushing claims, and because Harris-Ford was not entitled to judgment as a matter of law at trial, we reverse the judgment against Fay and remand for a new trial.

FACTS

In October 2013, Fay purchased a 2005 Saleen Mustang for $25,000 and an extended service contract for $4,100 from Harris-Ford. In early January 2014, Fay became dissatisfied with the Saleen and wanted to trade it in for a 2009 Shelby Mustang. According to Fay, Harris-Ford was asking $39,569 for the Shelby. At the time, Fay still owed $29,300 on the Saleen. Harris-Ford indicated it would credit a trade-in value of $16,800, leaving Fay with a negative equity balance of $12,500. Fay and Harris-Ford agreed to roll the amount owing on the Saleen into the purchase price of and financing for the Shelby.

During negotiations, Fay asked if the Saleen service contract could be transferred to the Shelby. Fay testified that Larry White, Harris-Ford's finance manager, represented that the service contracts had "no value" once he traded in the Saleen. Fay stated that Harris-Ford agreed to give him a "credit" of $3,000 toward the cash down payment of $3,900 to reflect the service contract purchase price he would otherwise lose by trading in the Saleen. Fay stated Harris-Ford used this credit to "seal the deal on the newer Mustang." Fay testified this credit was "one of the main reasons [he] went through with the trade-in of the Saleen Mustang for such a low amount and for deciding to go through with purchasing the Shelby Mustang." Fay also agreed to purchase a new service contract for the Shelby for $2,899.

Harris-Ford disputed Fay's version of events. Harris-Ford's General Manager, Luk Blackwell, testified that the dealership requested a cash down payment of $3,900, with Fay paying $900 at signing and the remaining balance to

be paid from the refund of the cancelled Saleen service contract. But Fay testified that no one at Harris-Ford mentioned a refund for cancelling the service contracts or using any refund to pay the down payment. Harris-Ford has nothing in writing documenting an oral agreement to use a service contract refund to cover the down payment.

Fay signed three documents for the purchase of the Shelby on January 7, 2014—a vehicle buyer's order (VBO), a retail installment sale contract (RISC), and a vehicle return agreement (VRA) (the Agreement). The VBO listed the down payment, net trade-in allowance, and total credits as follows:

| | | | | |
|---|---|---|---|---|
| 1. | BASE PRICE OF VEHICLE | | | 37,250.00 |
| 2. | DEALER ADDED OPTIONS: ETCH | | | 150.00 |
| 3. | BASE PRICE OF VEHICLE AND OPTIONS (1 PLUS 2) | | | 37,400.00 |
| 4. | ESTIMATED Vehicle Excise Tax, License, Title and Registration Fees, Bank Title Lien Release Fee $ ___N/A___ (including $3.00 Arbitration Fee on New Cars) ($2.50 Dealer Administrative Fee) | | | 161.50 |
| 5. | DOWN PAYMENT (Not receipt for cash received.) | (A) CASH | 3,900.00 | 3,900.00 |
| | | (B) REBATE | N/A | |
| 6. | ESTIMATED Net Trade-In Allowance | | | -12,500.00 |
| 7. | TOTAL CREDITS (5 + 6) | | | -8,600.00 |
| 8. | SALES TAX (Calculated on the difference between Cash Price of Vehicle and Options (Line 3 above) and Gross Trade-In Allowance) | | | 2,018.80 |
| 9. | DOCUMENTARY SERVICES FEE | | | 150.00 |
| 10. | SERVICE CONTRACT | | | 2,899.00 |
| 11. | MAINTENANCE CONTRACT | | | N/A |
| 12. | SALES TAX (For Service Contract and/or Maintenance Contract) | | | 275.41 |
| 13. | INSURANCE (Life, Disability, etc.) | | | N/A |
| 14. | OTHER | | | N/A |
| 15. | TOTAL CASH PRICE OF VEHICLE (3 + 4 + 8 + 9 + 10 + 11 + 12 + 13 + 14) | | | 42,904.71 |
| 16. | UNPAID BALANCE OF CASH PRICE DUE ON DELIVERY (15 - 7) | | | 51,504.71 |
| 17. | UNPAID BALANCE – AMOUNT FINANCED (15 - 7) | | | 51,504.71 |

The VBO credited $3,900 toward the balance owing on the Saleen and identified the total amount Fay owed "on delivery" as $51,504.71. Fay testified that when he

left the dealership with the Saleen that day, he had paid $900 in cash, and no one represented to him that there remained a balance due on the down payment.

To the contrary, the VBO contained an integration clause, indicating that there were no oral agreements between the parties:

> Buyer agrees that this agreement includes all of the terms and conditions on the front and back side hereof, that this agreement cancels and supersedes any prior agreement including oral agreements and, as of the date below, comprises, with any retail installment contract, service contract, insurance contract, and other agreements and acknowledgments signed contemporaneous herewith, the complete and exclusive statement of the terms of the agreement relating to the subject matters covered by this agreement. . . .

Fay understood the transaction was conditioned on financing. The RISC provided:

> By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay the Creditor-Seller (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge in U.S. funds according to the payment schedule below, as explained in section 1 on the back.

The RISC identified the "Amount Financed" as $51,504.71, the same amount reflected in the VBO. Fay's first payment of $669.91 was due on February 21, 2014. The VBO also included a financing contingency:

> If a retail installment contract . . . is signed in conjunction with this buyer's order (collectively, the "Agreement"), the Agreement is binding upon execution, provided however, that the dealer will hereafter assess the buyer's creditworthiness and if the dealer does not hereafter approve financing on account of the buyer's creditworthiness and subsequently notifies buyer of such disapproval, this Agreement is void . . . .

The VRA provided additional details on the procedure should the financing condition not be satisfied. It also advised Fay of his rights under the bushing statute, RCW 46.70.180(4):

> It has also been explained to me that under RCW 46.70.180(4), the Dealership must contact me within four (4) calendar days . . . to advise me whether the financing condition is satisfied or not, and if not satisfied I understand the contract is deemed void. However, I recognize I can agree after being informed of the failure of the financing condition and the Dealership's compliance with RCW 46.70.180(4) to have the Dealership continue to pursue other financing options on my behalf.

The RISC stated that Harris-Ford assigned the contract "without recourse"[1] to Advantis Credit Union. Based on this notation, Fay left the dealership under the impression that Harris-Ford would notify him whether Advantis would finance the deal within this four-day time period.

According to Diana Thomas, a Senior Dealer Lending Specialist with Advantis, Harris-Ford submitted Fay's credit application and request for financing the same day, January 7, 2014. Fay heard nothing from Harris-Ford regarding the loan application or loan approval. Then on January 21, 2014, two weeks after Fay completed the purchase paperwork and drove away in the Shelby, he received an email from White, which stated:

> I didn't have you sign a form for the cancellations from your previous car that we are using as part of your down. So instead of having you drive back here you can authorize us to use it by email. (I authorize Harris Ford [sic] to use my cancellations as additional down pmt.) And that will take care of the down payment.

---

[1] Without recourse means the party assigning the debt has no further liability to any subsequent holder for payment. *Without Recourse*, BLACK'S LAW DICTIONARY (9th ed. 2009).

Fay refused to "modify" the contract because he understood that the down payment "was already 'taken care of' on January 7." Blackwell confirmed Fay would not sign paperwork to allow Harris-Ford to receive the service contract refund.

Fay testified he then called Advantis to check on financing. He learned that Advantis had not approved his loan because there was an insufficient down payment in relation to the loan amount. Thomas confirmed this fact, testifying that on January 27, 2014, Advantis notified Harris-Ford that Fay's loan application was outside of Advantis's lending guidelines. According to Fay, Advantis told him that Harris-Ford would have to finance the Shelby with another lender. Thomas, however, indicated Advantis made a "counter offer" to Harris-Ford, indicating it would fund the loan if it received an additional down payment of $1,697.20. Thomas further testified that Harris-Ford agreed to pay the additional down payment on January 28, 2014. But when Harris-Ford sent a check to the credit union to cover this additional amount, it identified an incorrect payee on the check, and Advantis notified Harris-Ford of the mistake on February 3, 2014.

On February 7, 2014, White called Fay and again told him that Fay needed to sign additional paperwork to release the service contract refund on the Saleen to the dealership as additional down payment on the Shelby. Again, Fay refused. Fay called Advantis the following day and was once again notified that the credit union had not approved his loan. Upon hearing this news, Fay called Harris-Ford multiple times to figure out what was happening. He spoke with a Harris-Ford employee, Erick Kelley, who told him that Harris-Ford "would take care of it and

[he] needn't worry." According to Fay, no one at the dealership informed him that Harris-Ford would finance the sale if Advantis would not.

In the meantime, Advantis informed Harris-Ford on February 10, 2014, that it was returning the Fay contract to the dealership because more than 30 days had passed since Fay had signed the initial credit application. On February 12, 2014, Harris-Ford sent Advantis a new check to cover the $1,697.20 down payment, but the credit union refused to accept the funds because the credit application had expired.

A few days later, on February 15, 2014, Advantis received a second credit application from Harris-Ford requesting financing for Fay's purchase of the Shelby. The dealership did not tell Fay it resubmitted his previously signed application.

On February 21, 2014, the day Fay's first payment was due on the Shelby, Fay did not know where to send the loan payment so he decided to return the vehicle to the dealership. When he took the car back, a Harris-Ford employee told Fay that financing had been approved by Advantis. But Fay did not believe him because Advantis had, earlier that same day, told him again that financing was not approved. Fay left the vehicle and keys at Harris-Ford, along with a letter explaining the lack of confirmation of financing as the reason for returning the Shelby.

Thomas testified that on February 26, 2014, Advantis notified Harris-Ford that it needed the first loan payment for the Fay purchase in order to fund the loan. Harris-Ford informed Advantis it would send a check to cover this payment.

Advantis received the check on February 27, 2014, and funded the loan the same day.

In early March 2014, Fay received notice from Advantis that a payment was due on the Shelby. Fay contacted Advantis and learned, for the first time, that Harris-Ford had covered the down payment gap of $1,697.20 and had made the first scheduled monthly payment after Fay had returned the vehicle to the dealership. The dealership did not notify Fay it intended to make these payments on his behalf.

Harris-Ford subsequently repurchased the installment contract from Advantis and notified Fay that it planned to sell the Shelby. Harris-Ford sold the vehicle for $30,999 in October 2014. Harris-Ford claimed Fay owed it a deficiency under the VBO of $21,777.24.

Fay sued Harris-Ford in June 2014, alleging the dealership misrepresented the terms of the down payment and violated RCW 46.70.180(4), a per se violation of the CPA. Harris-Ford filed a counterclaim for breach of contract and sought a deficiency judgment against Fay.

Harris-Ford filed a motion for summary judgment seeking the dismissal of Fay's claims and the entry of a deficiency judgment against him. Fay, who had new counsel appear just before his responsive pleadings were due, sought a continuance of the summary judgment hearing. The trial court denied this request.

The trial court granted Harris-Ford's motion in part, finding no issues of material fact, except as to Fay's claim that Harris-Ford violated the bushing statute by not advising him that the financing contingency had been waived within the

statutory four-day period. It reserved ruling on Fay's CPA claim as to the bushing statute violation. It provisionally granted Harris-Ford's motion for summary judgment on its counterclaim for breach of contract, pending the outcome of trial on the bushing and CPA violations.

At trial, Fay admitted that White had stated Fay was "creditworthy," but did not tell him that his financing had been unconditionally approved. Fay testified that he understood White's statement to mean that while his credit scores and history of paying bills made him creditworthy, that did not mean his loan had been approved or that the dealership was agreeing to waive the financing contingency.

At the conclusion of Fay's case-in-chief, Harris-Ford moved for judgment as a matter of law, arguing that Fay's admission that White told him he was creditworthy constituted compliance with the bushing statute as a matter of law. The trial court agreed, reasoning that notification of creditworthiness was notification that the dealer had unconditionally accepted the contract. The court found Fay had breached the contract by failing to make payments on the loan to Harris-Ford, Harris-Ford had not violated the bushing statute, and Harris-Ford was entitled to entry of a deficiency judgment, reasonable attorney fees, and costs. The court entered judgment against Fay in the amount of $21,001.41, interest of $2,552.03, attorney fees of $65,375.02, and costs of $240.00, for a total judgment of $89,168.66.

Fay filed a motion for reconsideration and a new trial, based partially on new evidence that the dealership had received over $2,800 from refunds on the service contracts for both the Saleen and the Shelby. Harris-Ford conceded it

miscalculated the amount Fay owed on the deficiency judgment. First, it claimed it had failed to include in the deficiency judgment the $3,000 down payment it alleged Fay owed under the Agreement. Second, it admitted Fay was entitled to a credit of $2,646.87 against the judgment to reflect the amount the dealership had received as a refund from the Saleen service contracts. It entered a partial satisfaction of judgment to reflect this credit.

The trial court denied Fay's post-trial motions. It found the new evidence Fay proffered could have raised a genuine issue of fact as to whether there had been a misrepresentation, but no trier of fact could conclude the misrepresentation caused Fay any harm. The court also concluded that the deficiency judgment was less than if the newly found evidence had been considered and, as a result, the newly discovered evidence would not have improved Fay's position.

Fay appeals.

## ANALYSIS

Fay raises three issues on appeal. First, he contends the trial court abused its discretion in denying his motion to continue the summary judgment hearing. Second, he argues the trial court erred in dismissing on summary judgment Fay's misrepresentation and bushing claims and in granting Harris-Ford's breach of contract counterclaim. Finally, Fay maintains the trial court erred by granting Harris-Ford's motion for judgment as a matter of law at the close of Fay's case-in-chief.[2]

---

[2] Fay has not challenged on appeal the trial court's dismissal of Fay's breach of contract or breach of warranty claims. Nor has he assigned error to the trial court's dismissal of Fay's claim that the Agreement included a condition that it had to be assigned to a lender during the four-day bushing period.

A. Motion to Continue Summary Judgment Hearing

Fay argues the trial court abused its discretion by denying his motion to continue the summary judgment hearing. We disagree.

We review this decision for an abuse of discretion. Pitzer v. Union Bank of Cal., 141 Wn.2d 539, 556, 9 P.3d 805 (2000). CR 56(f) allows a trial court to grant a continuance if the party requesting the continuance provides an affidavit showing a need for additional time to obtain affidavits, take depositions, or conduct other discovery. Butler v. Joy, 116 Wn. App. 291, 299, 65 P.3d 671 (2003). The trial court has the discretion to deny a continuance when (1) the requesting party does not have a good reason for the delay in obtaining the evidence; (2) the requesting party does not indicate what evidence would be established by further discovery; or (3) the new evidence would not raise a genuine issue of fact. Coggle v. Snow, 56 Wn. App. 499, 507, 784 P.2d 554 (1990).

Fay moved to continue the summary judgment hearing seeking time to depose White to discover information about the Saleen service contract refunds. But the record establishes Fay had had three years to conduct this discovery. He filed suit in June 2014, conducted two rounds of written discovery between September 2014 and February 2017, amended his complaint in 2015, and argued cross-motions for partial summary judgment in 2016. Given that litigation was in its third year when Fay's counsel requested the continuance, it was within the trial court's discretion to deny the continuance.

B. <u>Harris-Ford's Motion for Summary Judgment</u>

Next, Fay argues the trial court erred in dismissing his misrepresentation, bushing, and CPA claims on summary judgment, and in granting summary judgment to Harris-Ford on its counterclaim. We address each claim in turn below.

We review summary judgment de novo and engage in the same inquiry as the trial court. <u>Heath v. Uraga</u>, 106 Wn. App. 506, 512, 24 P.3d 413 (2001). Summary judgment is appropriate if, in view of all the evidence, reasonable persons could reach only one conclusion. <u>Hansen v. Friend</u>, 118 Wn.2d 476, 485, 824 P.2d 483 (1992); <u>see also</u> CR 56(c). On review, Fay is entitled to have us look at the evidence in a light most favorable to him and against Harris-Ford. <u>Herron v. Tribune Publ'g Co.</u>, 108 Wn.2d 162, 170, 736 P.2d 249 (1987).

1. <u>Misrepresentation</u>

Fay argues there were disputed facts as to whether Harris-Ford misrepresented the total amount of down payment for which he was responsible. App. Br. at 1, 32. To establish fraudulent misrepresentation, Fay must prove:

> (1) representation of an existing fact, (2) the materiality of the representation, (3) the falsity of the representation, (4) the speaker's knowledge of the falsity of the representation or ignorance of its truth, (5) the speaker's intent that the listener rely on the false representation, (6) the listener's ignorance of its falsity, (7) the listener's reliance on the false representation, (8) the listener's right to rely on the representation, and (9) damage from reliance on the false representation.

<u>Landstar Inway Inc. v. Samrow</u>, 181 Wn. App. 109, 124, 325 P.3d 327 (2014). Fay must prove every element by clear, cogent, and convincing evidence. <u>Baertschi v. Jordan</u>, 68 Wn.2d 478, 482-83, 413 P.2d 657 (1966).

We conclude the trial court erred in granting Harris-Ford's summary judgment on Fay's fraudulent misrepresentation claim. First, Fay presented evidence that Harris-Ford made a misrepresentation of a material fact—that the Saleen service contracts had no value and that the Agreement included a $3,000 "credit" from the dealership as an incentive to "seal the deal." Fay testified:

4. Larry White told me on January 7, 2014 that the down payment for the 2009 [Shelby] Mustang would be $3,900, and that I only needed to pay $900 of that. I paid only $900 that day.

5. I noted that the sale document reflected that a cash down payment of $3[,]900 had been applied as a credit. I was led to believe the dealership was using that $3,000 [as] an incentive to seal the deal on the newer Mustang.

Fay testified that no one ever told him he would be responsible for the remaining $3,000 down payment or that he needed to relinquish his right to a refund under the Saleen service contract to cover that portion of the down payment.[3] Blackwell's testimony that Fay agreed to pay the balance of the $3,900 cash down payment from refunds on the cancelled Saleen service contracts directly conflicts with Fay's version of events.

Second, there was circumstantial evidence from which a trier of fact could conclude that Harris-Ford knew this statement, when made, was false, in light of White's subsequent communications with Fay asking him to execute documents necessary to release the refund to the dealership. A reasonable trier of fact could

---

[3] Harris-Ford argues that under clauses (2)(e) and (3)(g) of the Saleen RISC, it was contractually entitled to the service contract refunds to reduce the amount Fay owed on that vehicle loan before the net amount was rolled into the loan for the Shelby. But Harris-Ford did not raise this argument on summary judgment. Sourakli v. Kyriakos, Inc., 144 Wn. App. 501, 509, 182 P.3d 985 (2008) ("An argument neither pleaded nor argued to the trial court cannot be raised for the first time on appeal."); see also RAP 9.12. We decline to address this argument made for the first time on appeal.

- 13 -

also conclude Harris-Ford wanted Fay to rely on this representation in order to convince him to trade in the Saleen for the Shelby. A trier of fact could also find that Fay was unaware of his refund rights, based on Fay's declaration testimony to that effect.

A trier of fact could also find that Fay's reliance on these representations was reasonable because there is nothing in the Agreement to contradict Fay's understanding of the deal's terms. There is no written agreement, signed by Fay, to reflect his consent to assign service contract refunds to Harris-Ford to cover any portion of the down payment. The Agreement actually provided that the total amount "due on delivery" of the Shelby was $51,504.71. This sum reflects the total sum to be financed. And the VBO contains an integration clause indicating that there were no oral agreements between the parties. Thus, nothing in the Agreement indicates that Fay still owed $3,000.

Finally, there is evidence that Fay relied on the representations to his detriment. According to Fay, "[i]f the deal would have required me to pay the $3,000 balance or relinquish an asset valued at that amount, I would not have bought the car." And we cannot conclude from the record before us that Fay was not damaged by the misrepresentation. Although counsel for Harris-Ford indicated in response to Fay's motion for reconsideration that he failed to include the $3,000 down payment in his deficiency judgment calculation, there are questions of fact regarding the total amounts the dealership received for the service contract refunds on both vehicles and whether the dealership was actually entitled to those refunds in the first instance. Because this evidence was not presented until after

summary judgment and trial, we cannot consider it. RAP 9.12; see also Vernon v. Aacres Allvest, LLC, 183 Wn. App. 422, 436, 333 P.3d 534 (2014).

If Harris-Ford committed fraud to induce Fay to sign the Agreement, the transaction was voidable. Pedersen v. Bibioff, 64 Wn. App. 710, 722, 828 P.2d 1113 (1992); see also Restatement (Second) of Contracts § 163 (Am. Law Inst. 1981). If Harris-Ford intentionally misrepresented to Fay that it was granting him a $3,000 "credit" and intentionally chose not to tell Fay that his service contract refund was going to be used to cover this "credit," then Fay's attempt to rescind the Agreement when he delivered the Shelby to the dealership on February 21, 2014, would have been valid.[4]

Because, there are genuine issues of material fact on Fay's claim of fraudulent misrepresentation, we conclude the trial court erred in dismissing this claim on summary judgment.

2. Bushing Statute Violation

Fay also alleged two violations of the bushing statute—(1) Harris-Ford failed to notify Fay within four days of signing the Agreement that it had unconditionally accepted or waived the financing contingency, and (2) Harris-Ford attempted to change the conditions of the Agreement by requesting, two weeks after-the-fact, that Fay sign additional paperwork authorizing the dealership to use the Saleen service contract refunds toward the down payment on the Shelby. Fay

---

[4] We point out, however, that if the Shelby transaction is rescinded, Fay may still owe money to Harris-Ford on the Saleen loan. We have no evidence before us as to whether Harris-Ford resold that vehicle and, if so, whether it was able to resell it for more than Fay owed on the loan at the time he purchased the Shelby. We leave the resolution of that issue for the trial court on remand.

argues the trial court erred by dismissing the second of these two statutory claims on summary judgment.

RCW 46.70.180(4)(a) makes it unlawful to commit any act of "bushing,"[5] defined as entering into a written agreement signed by the prospective buyer which

> [i]s subject to any conditions or the dealer's . . . future acceptance, and the dealer fails or refuses . . . within four calendar days, . . . to inform the buyer . . . [t]hat the dealer unconditionally accepts the contract[,] . . . having satisfied, removed, or waived all conditions to acceptance or performance, including, but not limited to, financing, assignment, or lease approval . . . .

Harris-Ford's summary judgment motion did not seek to dismiss Fay's claim that the dealership unlawfully changed the conditions of the Agreement after-the-fact by asking Fay to release his right to the Saleen service contract refunds to fund the down payment.[6] The trial court's written order on summary judgment was silent as to this bushing claim. We do not have a verbatim report of proceedings from the summary judgment hearing. In the narrative report of proceedings, the trial court apparently "found that Harris Ford's [sic] request that Brian Fay give written permission for it to collect refunds on the service contract for the traded-in vehicle did not violate the bushing statute." But a "trial court's oral or memorandum opinion is no more than an expression of its informal opinion at the time it is rendered. It has no final or binding effect unless formally incorporated into the findings, conclusions, and judgment." State v. Mallory, 69 Wn.2d 532, 533-34, 419

---

[5] "Bushing" occurs when a car dealer obligates a buyer to buy a vehicle but reserves to itself the ability to accept or reject the terms of the deal for a period of more than three days. RCW 46.70.180(4)(a); Banuelos v. TSA Wash., Inc., 134 Wn. App. 603, 611, 141 P.3d 652 (2006).

[6] Harris-Ford withdrew its summary judgment motion on the first bushing claim, conceding Fay had raised genuine issues of material fact in his response to its motion.

P.2d 324 (1966). Because the trial court failed to address the second bushing claim in its written order, there was in effect no final ruling on the claim, and we remand it for resolution by the trial court.

### 3. Consumer Protection Act Claims

Fay alleged two CPA violations—Harris-Ford's alleged violations of the bushing statute[7] and its alleged misrepresentations to Fay that the down payment would be covered by a dealership "credit." The trial court, on summary judgment, dismissed the latter of these two CPA claims. On appeal, Fay argues the trial court erred in dismissing this claim. We disagree.

The CPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020. To establish a CPA violation, Fay must establish all five of the following elements: (1) an unfair or deceptive act (2) in trade or commerce (3) that affects the public interest, (4) injury to the plaintiff in his or her business or property, and (5) a causal link between the unfair or deceptive act complained of and the injury suffered. Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc., 162 Wn.2d 59, 74, 170 P.3d 10 (2007). Whether an action violates the CPA is a question of law reviewed de novo. Bavand v. OneWest Bank, 196 Wn. App. 813, 840, 385 P.3d 233 (2016).

Ordinarily, a breach of a private contract or a claim of fraud affecting no one but the parties to the contract is not an act or practice affecting the public interest. Sloan v. Thompson, 128 Wn. App. 776, 792, 115 P.3d 1009 (2005) (quoting Hangman Ridge v. Safeco Title, 105 Wn.2d 778, 790-91, 719 P.2d 531 (1986)). A

---

[7] RCW 46.70.310 makes a violation of RCW 46.70.180(4) a per se violation of the CPA.

plaintiff must have evidence that additional plaintiffs have been or will be injured in the same fashion to change the factual pattern from a private dispute to one that affects the public interest. Id. (quoting Hangman Ridge, 105 Wn.2d at 790-91). Even if there are genuine issues of material fact whether Harris-Ford misrepresented the terms of Fay's down payment and whether this conduct, if true, is an unfair or deceptive act in trade or commerce, there is no evidence that Harris-Ford engaged in this same practice with any other vehicle purchasers. Thus, the trial court did not err in granting summary judgment on this CPA claim.

### 4. Harris-Ford's Breach of Contract Counterclaim

Next, Fay argues the trial court erred in granting Harris-Ford's motion for a deficiency judgment. Harris-Ford contended it was entitled to summary judgment because Fay had defaulted on making any payment under the Shelby RISC. Fay countered that he was entitled to return the Shelby to the dealership under the Uniform Commercial Code[8] (UCC) and, as a result, Harris-Ford had no legal entitlement to any payments under the Agreement.

On appeal, Fay argues the trial court erred in failing to address his affirmative defenses of anticipatory repudiation under RCW 62A.2-610; the dealership's failure to respond to his demand for adequate assurances under RCW 62A.2-609; and impossibility of performance, failure to mitigate damages, and failure to perform a condition precedent. With the exception of RCW 62A.2-609, Fay admits he did not plead these defenses, and we can find no evidence he raised any of them below. We will not address these affirmative defenses for the

---

[8] Title 62A RCW.

first time on appeal. See Port of Pasco v. Stadelman Fruit, Inc., 60 Wn. App. 32, 37, 802 P.2d 799 (1990) (when substantial rights of the parties will be affected, affirmative defenses may not be raised for the first time on appeal).

We also find no merit to Fay's "reasonable assurances" defense. The UCC provides that "[a] contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired." RCW 62A.2-609(1). If "reasonable grounds for insecurity arise with respect to the performance of either party[,] the other may in writing demand adequate assurance of due performance." Id. Until such assurance is provided, the party may "if commercially reasonable," suspend performance. Id. Failing to provide this assurance within 30 days is a repudiation of the contract. RCW 62A.2-609(4).

The adequacy of a demand for assurances is generally a question of fact. Alaska Pac. Trading Co. v. Eagon Forest Prods., Inc., 85 Wn. App. 354, 364, 933 P.2d 417 (1997). But it may be resolved on summary judgment if reasonable persons could reach only one conclusion. Id. A demand for assurances must be clear and unequivocal. Id. at 363-64. A less clear statement will be considered sufficient only when the interaction between the parties is such that both understand that the demanding party will withhold performance unless assurances are forthcoming. Id. at 364.

Fay contends he sought assurances under the UCC when, on February 18, 2014, he notified Harris-Ford in writing that he considered the contract void for lack of financing. Fay cites to an unsigned letter dated February 18, 2014, in which Fay recounted his attempts to obtain information about financing. In this letter, Fay

stated, "As of today 2/18/14 I have not heard back from Harris Ford [sic] and . . . therefore deem this contract for the purchase of this Shelby void. I plan on returning the vehicle to Harris Ford [sic] on Wednesday[,] February 19th 2014." But according to Fay's declarations, he delivered the Shelby and its keys the same day he delivered this letter to Harris-Ford, on February 21, 2014.

A document declaring a contract void, delivered on the same day as the purchased item is returned to the seller, is not a "written demand for adequate assurance of due performance" under RCW 62A.2-609(1); instead, it is an act of repudiation of the contract. See State v. Brown, 92 Wn. App. 586, 602, 965 P.2d 1102 (1998) (party's unequivocal statement that he or she will not or cannot perform a contract constitutes a repudiation of that contract).

Although the trial court did not err in rejecting Fay's UCC defense, it nevertheless erred in granting summary judgment to Harris-Ford on its counterclaim because there are genuine issues of material fact as to whether Harris-Ford fraudulently misrepresented material terms of the deal to induce Fay to enter into the transaction. If Harris-Ford fraudulently induced Fay to purchase the Shelby, the transaction is voidable. Pedersen, 64 Wn. App. at 722. If the transaction is voidable, then Fay's return of the vehicle constituted a rescission, and he did not breach the contract by not making any payments. See Yakima County (West Valley) Fire Prot. Dist. 12 v. City of Yakima, 122 Wn.2d 371, 390, 858 P.2d 245 (1993) (fraudulent misrepresentation makes contract voidable); Skagit State Bank v. Rasmussen, 109 Wn.2d 377, 384, 745 P.2d 37 (1987)

(rescission adequate remedy for voidable contract). We therefore reverse summary judgment on Harris-Ford's deficiency counterclaim.[9]

## C. Harris-Ford's Motion for Judgment as a Matter of Law

Lastly, Fay contends the trial court erred in granting Harris-Ford's motion for judgment as a matter of law on his bushing claim at the conclusion of his case-in-chief. We agree.

Judgment as a matter of law may be granted only if there is no legally sufficient evidentiary basis for a reasonable fact finder to find for the nonmoving party with respect to that issue. CR 50(a)(1). A motion for judgment as a matter of law admits the truth of the evidence of the nonmoving party and all inferences that reasonably can be drawn therefrom. Ramey v. Knorr, 130 Wn. App. 672, 675-76, 124 P.3d 314 (2005). This court reviews a motion for judgment as a matter of law de novo, considering the evidence in the light most favorable to Fay, as the nonmoving party. Id. at 676.

At trial, Fay testified that during his negotiations to purchase the Shelby, he and White went over the financing terms. They discussed the interest rate and number of payments, and White confirmed the date the first payment would be due. Fay unequivocally testified that White at no point told him that financing was unconditionally approved. When asked what White said, Fay testified, "He said I was creditworthy." Fay testified he understood "creditworthy" to mean that "the

---

[9] Because we reverse the trial court's summary judgment orders, with the exception of the stand-alone CPA claim, we need not reach the issue of whether the court erred in denying Fay's post-trial motion to vacate these orders under CR 60. With regard to the CPA claim, in his post-trial motion to vacate, Fay still presented no evidence that Harris-Ford engaged in the same practice with other vehicle purchasers. Thus, the trial court did not err by denying the motion to vacate its summary judgment ruling on that claim.

loan is not approved or it would have to be put through a credit union, but my FICO scores and my history of paying bills timely made me creditworthy." He testified that no one from the dealership ever confirmed financing.

At the close of Fay's case-in-chief, Harris-Ford moved for judgment in its favor, arguing that informing Fay he was creditworthy satisfied the unconditional acceptance requirement of the bushing statute. The trial court agreed and granted Harris-Ford's motion. It concluded "Harris[-Ford] fulfilled its obligations pursuant to the parties [sic] contract by informing [Fay] that the credit worthiness condition was satisfied, without any conditions to that statement, within four (4) days . . . of the contract execution."

RCW 46.70.180(4)(a) makes it unlawful for a dealership to wait more than four calendar days to inform a buyer that all conditions of the contract have been satisfied, removed, or waived. The VBO provided that "the agreement is binding upon execution, provided however, that the dealer will hereafter assess the buyer's creditworthiness." Harris-Ford contends Fay admitted it made an assessment of Fay's creditworthiness and notified him of its determination before Fay left the lot with the Shelby. But this argument ignores language in both the VBO and the VRA requiring Harris-Ford to notify Fay that it was waiving the financing contingency for the deal. The VBO provided that "the dealer will hereafter assess the buyer's creditworthiness[,] and if the dealer does not hereafter approve financing on account of the buyer's creditworthiness," the deal would be void.

Similarly, the VRA expressly provided that the deal was conditioned on approval of Fay's credit, not merely on the fact that he was "creditworthy":

- 22 -

> I understand that the sale or lease of the below-described vehicle is conditioned upon the Dealership[']s approval of my credit. If the approval does not occur, the contract will be deemed null and void. I understand you may and I consent to you submitting my credit application and the contract to more than one lending institution in consideration of approval of the financing condition. Should the Dealership be unable to give finance approval, I understand you may ask that I return the vehicle to the Dealership . . . .
>
> It has also been explained to me that under RCW 46.70.180(4), the Dealership must contact me within four (4) calendar days . . . to advise me whether the financing condition is satisfied or not, and if not satisfied, I understand the contract is deemed void. . . .
>
> I agree that "notification" as to approval or rejection of financing shall include, but is not limited to, notification by telephone or in person, fax, letter and/or voice message. . . .

The fact that White told Fay he was creditworthy does not, as a matter of law, constitute notification to a buyer that Harris-Ford deemed the financing contingency to be satisfied, removed, or waived. Considering a person to be creditworthy is not the same as approving that person for a particular loan. "Creditworthy" is defined as "financially sound enough that a lender will extend credit in the belief default is unlikely; fiscally healthy." *Creditworthy*, Black's Law Dictionary (9th ed. 2009). In lay terms, it is defined as "having a satisfactory credit rating." RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 473 (2001).

Fay testified that although he understood that White believed him to be a good candidate for a loan, he did not understand the dealership to have waived the requirement that he qualify for a loan through a credit union. White testified via declaration on summary judgment that he orally informed Fay on the day he signed the contract that "the finance condition was unconditionally satisfied." Had he taken the stand to so testify and had the trier of fact found this testimony to be

- 23 -

more credible than Fay's version of events, there would be a basis for concluding that Harris-Ford complied with the bushing statute. But Fay's testimony alone provided a sufficient evidentiary basis for a reasonable fact finder to find for him on his bushing claim. The trial court thus erred in granting Harris-Ford's motion for judgment as a matter of law.

We reverse the judgment against Fay, as well as the trial court's order on summary judgment[10] and its order on Harris-Ford's motion for judgment as a matter of law, and remand for further proceedings consistent with this opinion.

WE CONCUR:

_Andrus, J._

_Smith, J._

_Verellen, J._

---

[10] Except as to Fay's stand-alone CPA claim.